Honohan et al. *v.* Holt et al.

[Cite as Honohan v. Holt, 17 Ohio Misc. 57.]

(No. 224857—Decided November 26, 1968.)

Common Pleas Court of Franklin County.

*Mr. Joshua Kancelbaum, Mr. Bernard A. Berkman* and *Mr. John Childers,* for plaintiffs.

*Mr. William B. Saxbe,* attorney general, and *Mr. Charles F. Lopeman,* chief counsel, for defendant State Officers and Agencies.

*Messrs. Dunbar, Kienzle & Murphey* and *Mr. David J. Young,* for intervening defendant.

LEACH, J. On July 30, 1965, the Ohio General Assembly amended Section 3327.01, Revised Code, and enacted Section 3327.011, Revised Code, to become effective January 1, 1966. The title of the bill was "to provide all school children with safe transportation to and from school." Prior to that time the Ohio law had provided for transportation at public expense only to and from publicly-opened and operated schools. The 1965 amendment extended the transportation provisions to cover all children attending a "school for which the state board of education prescribes minimum standards," thus including "non-public" schools.

By this amendment and by later amendments to Sections 3327.01 and 3327.011, Revised Code, the Ohio law now provides that such transportation *shall* be made to such *elementary* school children who live more than two miles from the school "except when, in the judgment of the local board of education, confirmed by the state board of education, such transportation is unnecessary or unreasonable," and *may* be made for such *high school* pupils. The law further provides that in determining the necessity for transportation "availability of facilities and distance to the school shall be considered;" that a board of education shall not be required to transport pupils to or from a "non-public school where such transportation would require more than thirty minutes of direct travel time" and that where "it is impractical to transport a pupil by school conveyance, a board of education may, in lieu of providing such transportation, pay a parent, guardian, or other person in charge of such child, an amount per pupil which shall in no event exceed the average transportation cost per pupil," computed on the basis of the cost of trans-

porting all children in the state. This statute further provides that no transportation shall be provided to or from any school "which in the selection of pupils, faculty members, or employees, practices discrimination against any person on the ground of race, color, religion or national origin.

This is an action in which plaintiffs, as citizens and taxpayers attack the constitutional validity of the existing "Bus Law" of Ohio to the extent it authorizes and requires the expenditure of public funds, etc., "for the transportation of pupils to or from private religious schools at public expense," and seek declaratory judgment and injunctive relief to such effect. Specifically, it is asserted by plaintiffs that the Ohio "Bus Law" is violative of (1) the First Amendment of the United States Constitution and (2) of two provisions of the Ohio Constitution, Article I, Section 7 and Article VI, Section 2.

This case has been submitted to the court on motions of both sides for summary judgment in their favor. Extensive briefs in support of their respective positions have been filed.

In considering the constitutional issue involved we start with the fundamental proposition that a court is not the tribunal in which the propriety or the wisdom of a legislative enactment can be determined, since a court may concern itself only with the *power* of the Legislature to enact such a law. We start too with the basic principle that any enactment of the Legislature is presumed to be constitutional and where factual considerations are concerned in a determination of constitutionality, a court may decare a statute unconstitutional only on the basis that the needed factual foundation to support constitutionality *could* not reasonably be arrived at by the Legislature. *Bishop* v. *Board of Education,* 139 Ohio St. 427; *Dickman* v. *Defenbacher* (1955), 164 Ohio St. 142; *Jackman* v. *Court of Common Pleas* (1967), 9 Ohio St. 2d 159; 10 Ohio Jurisprudence 2d 201, 207, 235, 239, 240, 254.

In the light of these principles we need not discuss in any detail the statements of fact nor the statements

which, in effect, constitute expressions of opinion contained in the affidavits in support of and contra the respective motions for summary judgment. The allegations and admissions of the pleadings, together with the affidavits, clearly indicate (1) that plaintiffs do have standing under Ohio law to bring this action, (2) that defendants represent the agencies in Ohio which administer the Ohio "Bus Law," thus authorizing the rendition of a legally binding declaratory judgment by this court, (3) that under the "Bus Law" substantial state funds are being spent for the transportation of pupils to and from schools which are owned, maintained and administered by religious organizations, including Catholic, Lutheran, Seventh Day Adventists, Christian Reformed and Jewish, and (4) that these "private religious schools" must and do comply with the minimum educational standards established by the State Board of Education relative to curricula, books, teacher qualifications, etc., but in addition to such required curricula, most, if not all of such schools, do teach religious and sectarian values and may include at some time during the day devotional exercises.

The First Amendment to the United States Constitution provides that:

"Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof * * * *,"

By interpretation of the United States Supreme Court, the First Amendment is made applicable to the states by the Fourteenth Amendment. *Murdock* v. *Pennsylvania*, 319 U. S. 105.

In asserting that the Ohio "Bus Law" was violative of the First Amendment, plaintiffs at the time of the filing of this case were confronted with the fact that the United States Supreme Court in *Everson* v. *Board of Education* (1947), 330 U. S. 1, had held that the United States Constitution did not prohibit the state of New Jersey from spendding tax-raised funds to pay the bus fares of parochial school pupils, as part of a general program in which the state paid the fares of pupils of public and other schools.

We quote from the opinion of the court in that case:

"New Jersey cannot consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith or lack of it*, from receiving the benefits of public welfare legislation. While we do not mean to intimate that a state could not provide transportation only to children attending public schools, we must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general state law benefits to all its citizens without regard to their religious belief.

"Measured by these standards, we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools. It is undoubtedly true that children are helped to get to church schools. There is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the state. The same possibility exists where the state requires a local transit company to provide reduced fares to school children including those attending parochial schools, or where a municipally owned transportation system undertakes to carry all school children free of charge. Moreover, state-paid policemen, detailed to protect children going to and from church schools from the very real hazards of traffic, would serve much the same purpose and accomplish much the same result as state provisions intended to guarantee free transportation of a kind which the state deems to be best for the school children's welfare. And parents might refuse to

risk their children to the various dangers of traffic accidents going to and from parochial schools, the approaches to which were not protected by policemen. Similarly, parents might be reluctant to permit their children to attend schools which the state had cut off from such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks. Of course, cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them.

"This court has said that parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the secular educational requirements which the state has power to impose. See *Pierce* v. *Society of Sisters*, 268 U. S. 510. It appears that these parochial schools meet New Jersey's requirements. The state contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools.

"The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach. New Jersey has not breached it here."

It would appear clear that the Ohio "Bus Law" is not constitutionally distinguishable from the New Jersey law held to be constitutional in *Everson*. As a matter of fact, plaintiffs at no time have asserted that it is distinguishable. Instead the briefs on behalf of the plaintiff have attacked the reasoning of *Everson* and, in effect, predicted that with the change of the personnel of the court since 1947 such reasoning would not be followed by that court today. The

fact that the United States Supreme Court had rejected opportunities to reverse its holding in *Everson* by dismissing in 1961 a similar holding by the Supreme Court of Connecticut (*Snyder* v. *Town of Newton*, 147 Conn. 374, App. Diam. 365 U. S. 299), and by dismissing in 1967 a similar holding by the Supreme Court of Pennsylvania (*Roades* v. *School District*, 424 P. A. 202, App. Diam. 88 Sup. Ct. 61), the plaintiffs passed off as providing no true guide to the court's present reasoning since appeals may be dismissed on the basis of inadequacy of a record, etc. In essence it was the assertion of counsel of plaintiff that "In the absence of a recent *opinion* of the Supreme Court setting forth a basis of its decision which establishes *Everson's* continued doctrinal force, this court should hold that the Ohio 'Bus Law' contravenes the establishment clause of the First Amendment."

Such opinion has now been rendered by the United States Supreme Court. On June 10, 1968, that court decided the case of *Board of Education* v. *Allen*, 36 Law Week 4538, opinion No. 660. That decision upheld the constitutionality of a New York statute which provided for the purchase by the state of textbooks for use of students in grades 7 to 12 in all schools in the state, parochial as well as public. The provision had been challenged as violative of the establishment-of-religion clause of the First Amendment as applied to the states by the Fourteenth. In upholding the constitutionality of such New York law the court reiterated its holding in *Everson*, and in effect extended such holding beyond the field of transportation into the field of school books. The opinion of Mr. Justice White pointed out that while "payment of bus fares was of some value to the religious school" it was "nevertheless not such support of a religious institution as to be a prohibited establishment of religion within the meaning of the First Amendment"; that while *Everson* and later cases had shown "that the line between state neutrality to religion and state support of religion is not easy to locate," the "problem like many problems in constitutional law is one of degree." The test "between forbidden involvements of the state with religion and those

contacts which the Establishment Clause permits * * *,''
has been held to be ''what are the purpose and the *primary*
effect of the enactment?''

The court in *Allen* ''recognized that religious schools
pursue two goals, religious instruction and secular educa-
tion.''

Obviously a state has a basic interest in seeing that
its children receive proper secular education. Despite
this interest, there is no requirement that all children
attend publicly operated schools. *Pierce* v. *Society of
Sisters*, 268 U. S. 510. As stated in *Allen* ''A premise of
this holding was the view that the state's interest in educa-
tion would be served sufficiently by reliance on the secular
teaching that accompanied religious training in the schools
maintained'' by religious organizations.

In *Allen*, although books and not mere bus transporta-
tion were involved the court concluded that it could not
''agree with appellants, either that all teaching in a sec-
tarian school is religious, or that the processes of secular
and religious training are so intertwined that secular text-
books furnished to students by the public are, in fact, in-
strumental in the teaching of religion.''

In view of the opinion of the United States Supreme
Court in *Allen,* establishing the ''continued doctrinal force''
of *Everson*, we think that no doubt could exist that the
United States Supreme Court currently would hold the
Ohio ''Bus Law'' not violative of the First Amendment as
made applicable to the states by the Fourteenth Amend-
ment. As to the interpretation of a provision of the United
States Constitution, this court obviously is bound by and
should follow the decisions of the United States Supreme
Court in such respect.

While three members of the court did dissent in *Allen,*
each, in so doing, did not reject the rational of *Everson*
as it applied to *bus transportation* but merely differentiated
the supplying of *textbooks*. Mr. Justice Black, the author
of the opinion in *Everson*, stated in the course of his dis-
senting opinion in *Allen* that:

''Books are the most essential tool of education since
they contain the resources of knowledge which the educa-

tion process is designed to exploit. In this sense it is not difficult to distinguish books, which are the heart of any school, from bus fares, which provide a convenient and helpful general public transportation service. With respect to the former, state financial support actively and directly assists the teaching and propogation of sectarian religious viewpoints in clear conflict with the First Amendment's establishment bar; with respect to the latter, the state merely provides a general and nondiscriminatory transportation service in no way related to substantive religious views and beliefs.''

Mr. Justice Douglas, in the course of his dissent in *Allen*, stated:

''Whatever may be said of *Everson*, there is nothing ideological about a bus. There is nothing ideological about a school lunch, nor a public nurse, nor a scholarship. The constitutionality of such public aid to students in parochial schools turns on considerations not present in this textbook case. The textbook goes to the very heart of education in a parocohial school.''

Mr. Justice Fortas, in the course of his dissent, stated:

''This case is not within the principle of *Everson* v. *Board of Education* (1947), 330 U. S. 1. Apart from the differences between textbooks and bus rides, the present statute does not call for extending to children attending sectarian schools the same service or facility extended to children in public schools. This statute calls for furnishing special, separate, and particular books, specially, separately, and particularly chosen by religious sects or their representatives for use in their sectarian schools. This is the infirmity, in my opinion.''

In summarization as to the assertion by plaintiffs that the Ohio ''Bus Law'' is violative of the First Amendment to the United States Constitution, every argument contained in the briefs to such effect has been rejected by the United States Supreme Court either in *Everson* or *Allen*, or both, and for these reasons we conclude that the Ohio ''Bus Law'' is not violative of the provisions of the United States Constitution.

As heretofore noted, plaintiffs also assert that the

Ohio "Bus Law" is violative of two provisions of Article I, Section 7 and Article VI, Section 2, Ohio Constitution, which read:

Article I, Section 7, Ohio Constitution.

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted. No religious test shall be required, as a qualification for office, nor shall any person be incompetent to be a witness on account of his religious belief; but nothing herein shall be construed to dispense with oaths and affirmations.

"Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the general assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction."

Article VI, Section 2, Ohio Constitution.

"The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state; but no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this state."

All of the arguments made and rejected in *Everson* and in *Allen* are asserted herein as being applicable, in any event, to the provisions of the Ohio Constitution. In effect, it is asserted that in the interpretation of an Ohio constitutional provision, this court is not bound by any opinions of the United States Supreme Court in interpreting the Federal Constitution, whether the reasoning otherwise be analogous or not. In a literal or technical sense this of course is true. It also is asserted in effect that the Ohio constitutional provisions are "more restrictive" than the

provision of the First Amendment. With this assertion we do not agree. We think it clear that the reference in paragraph 2 of Article I, Section 7 to the encouragement of "schools and the means of instruction," immediately following references to religious denominations, makes it clear that the word "schools" contained in this constitutional provision is not limited to publicly owned and operated schools.

As to Article I, Section 7, Ohio Constitution, the key language of this provision, which plaintiffs assert have been violated by the Ohio "Bus Law," is that "no person shall be compelled to * * * support any place of worship * * * against his consent." In essence it is the assertion of plaintiffs that a "private religious school" is a "place of worship" within the purview of this constitutional provision, and that the use of tax funds for transportation of students to and from school compels the plaintiffs, as taxpayers, to "support" such "place of worship." In support of this argument reliance is had on the case of *Findlay* v. *Conneaut*, 145 Ohio St. 480. Accepting the principle that this constitutional provision and this case would hold that a "private religious school," conducting devotional exercises therein, would be a "place of worship," we conclude that the *indirect* benefits resulting to such school from bus transportation of students to and from school is not "support" of such "place of worship" within the purview of such constitutional provision. In so concluding we follow the same rationalization as followed by the Supreme Court in *Everson* and *Allen*, and in addition thereto again call attention to the provisions of the last paragraph of this constitutional provision providing for encouragement of schools and the means of instruction.

Thus we conclude that the Ohio "Bus Law" is not violative of the provision of Article I, Section 7, Ohio Constitution.

In essence, the assertion of plaintiffs as to Article VI, Section 2, Ohio Constitution is that a religious sect or sects are given "control of" some "part of the school funds of this state."

Here the argument made on behalf of plaintiffs is that since a sectarian school can locate its school buildings wherever it sees fit and since the necessity of transportation of children is somewhat dependent upon the location of such school in relation to the location of the home of such child, this gives the sectarian school "control over" the "school funds of this state."

While the happenstance of the number of children involved and the location of homes in relation to the school attended obviously will have an impact on the totality of the expenditures necessary, in our opinion the word "control," as used in the Ohio Constitution, cannot logically have reference to any such happenstance. It would be equally logical to argue that such "control" had thus been turned over to the parents. It is clear from an examination of all of the language of Sections 3327.01 and 3327.011, Revised Code, that "control" in its constitutional and legal sense over the "school funds of this state" remain in the hands of the General Assembly and in the state and local boards of education, all publicly elected bodies.

The statutes provide for transportation pursuant to time schedules adopted by boards of education, and not by religious organizations, and enable the co-ordinators, rather than religious organizations, to establish such transportation route schedules. Furthermore, such legislation excuses transportation when, in the judgment of a board of education, confirmed by the State Board of Education, such transportation is deemed unnecessary and unreasonable, and further authorizes a local board of education, where it is impractical to transport a pupil by a conveyance where such transportation otherwise would be required by the law, to pay the parent or other person in charge of the child an amount not in excess of the average cost of transporting other pupils. Note that such payment is not to the "private religious school" but to the parent.

The assertion of counsel for the plaintiffs that the "true purpose" of the Ohio General Assembly, in enacting the Ohio "Bus Law," was for the purpose of unconstitu-

tionally aiding religions and especially aiding the Catholic religion, since this is the largest of the "private religious schools," is not supported, even if we were to accept as *fact* the *opinions* contained in the affidavits in support of plaintiffs' motion for summary judgment.

While, of course, as held in *Everson* there is no constitutional requirement that bus transportation be supplied to all children not attending publicly-owned and operated schools, we think it clear that where a state chooses to provide such bus transportation to all children, it cannot then constitutionally deny such transportation to children attending privately-owned "religious schools" as contrasted to those attending privately-owned "non-religious schools." To do so, as clearly inferred in *Everson* and *Allen*, would be to deny general welfare benefits provided for others based on the exercise of religious beliefs. To grant the declaration sought by plaintiffs herein would be to declare that the public welfare benefits, provided by the Ohio "Bus Law," would be provided to pupils attending public schools and to pupils attending non-public schools not owned or operated by religious institutions or organizations, but denied to pupils attending schools owned or operated by religious institutions or organizations, even though such schools are state accredited and even though they comply in all respects by teaching all of the secular courses established and required by the State Department of Education.

While under both the Constitution of the United States and the Constitution of the state of Ohio the doctrine of separation of church and state is fundamental, the Ohio "Bus Law" provides benefits for children, not religions. Plaintiffs' religious liberty is no less secure now that children are receiving the benefits of safe and expeditious transportation to and from all accredited schools in Ohio. As a matter of constitutional law the fact, if it be a fact, that some other Legislature might have devised other methods just as safe, is not the issue in this case. Here, the legislation under consideration gives no preference to any person, organization, church or religion.

No useful purpose would be served in discussing the

laws of other states and the decisions relative thereto providing for school bus transportation to pupils in attendance at all accredited schools. It might be noted, however, that at least 22 other states now provide such transportation, these being California, Connecticut, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Montana, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oregon, Pennsylvania, Rhode Island, West Virginia and Wisconsin.

While the states of Oklahoma, Delaware, Alaska and Washington have held comparable statutes unconstitutional under the particular language of their constitutions, and while there are lower court decisions in Iowa and Missouri to this effect, we shall not make any attempt to compare the particular language of these other constitutions with the language of the Ohio Constitution. Instead we merely conclude that we are in agreement with the rationalization followed by the United States Supreme Court in *Everson* and in *Allen as applied to the Ohio "Bus Law,"* and that applying such reasoning to the Ohio constitutional provisions, we conclude that the Ohio "Bus Law" is not in conflict with either the provisions of the United States Constitution or the provisions of the Ohio Constitution.

We, therefore, sustain the motion of the defendants for summary judgment in their favor, declaring such law to be constitutional, and dismissing the petition herein, at the costs of the plaintiffs. The motion of plaintiffs for summary judgment in their favor, of course, is overruled as well as their prayer for permanent injunction. Entry to such effect may be prepared accordingly, reserving exceptions.