(No. 45189, 45242 cons.—

BOARD OF EDUCATION, SCHOOL DISTRICT No. 142, COOK COUNTY, ILLINOIS, Appellant, v. MICHAEL J. BAKALIS, Superintendent of Public Instruction, *et al.*, Appellees.

*Opinion filed June 25, 1973.*

450

RYAN, J., specially concurring.

KLEIN, THORPE, KASSON & JENKINS, of Chicago (FRANKLIN W. KLEIN and ROBERT F. PECK, of counsel), for appellant.

EDWARD V. HANRAHAN, State's Attorney, and PAUL STICKLER and ALLEN D. SCHWARTZ, Special Assistant Attorneys General, all of Chicago (VINCENT BENTIVENGA, JR., Chief, Civil Division, E. MICHAEL KELLY and PAUL P. BIEBEL, JR., Assistant State's Attorneys, of counsel), for appellees.

KIRKLAND & ELLIS, of Chicago (DON H. REUBEN, LAWRENCE GUNNELS, JAMES C. MUNSON and

JAMES A. SERRITELLA, of counsel), for *amicus curiae,* the Catholic Bishop of Chicago.

KLEIN, THORPE, KASSON & JENKINS, of Chicago (FRANKLIN W. KLEIN and ROBERT F. PECK, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and BERNARD CAREY, State's Attorney, of Chicago (PAUL STICKLER and ALLEN D. SCHWARTZ, Special Assistant Attorneys General, and PAUL P. BIEBEL, JR., Assistant State's Attorney, of counsel), for appellees.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

In each of these cases plaintiff, Board of Education of School District No. 142, Cook County, upon allowance of a motion filed under Rule 302(b) (52 Ill.2d R. 302(b)), appeals directly to this court from the judgment of the circuit court of Cook County dismissing its action for injunction and declaratory judgment. Although separately briefed and argued, the cases have been consolidated for opinion. In No. 45189, plaintiff sought a declaratory judgment that section 29—4 of the School Code of 1961 (Ill. Rev. Stat. 1971, ch. 122, par. 29—4), which requires a school board to provide the same transportation along its regular school bus routes for nonpublic school pupils as it provides for its public school pupils, was unconstitutional, and the issuance of a writ of injunction enjoining the defendants, the Superintendent of Public Instruction and the County Superintendent of Schools of Cook County, from withholding State Aid funds because of plaintiff's refusal to furnish transportation to nonpublic school

pupils. In No. 45242 plaintiff sought a declaratory judgment that sections 2—3.7, 2—3.8, 3—10 and 3—14.7 of the School Code (Ill. Rev. Stat. 1971, ch. 122, pars. 2—3.7, 2—3.8, 3—10 and 3—14.7) were unconstitutional and also asked that the defendants, the Superintendent of Public Instruction and the County Superintendent of Schools of Cook County, be enjoined from withholding State Aid to the plaintiff because of its refusal to follow, and act in accordance with, the opinions and rulings of the defendants.

School District 142, of which plaintiff school board is the governing body, maintains grades 1 through 8 inclusive in three schools in the Village of Oak Forest and an adjoining unincorporated area. Plaintiff was requested to furnish bus transportation for more than 76 pupils enrolled in St. Damian School in Oak Forest, and St. Christopher School in Midlothian. It is plaintiff's position that there are no seats available on its buses and that in order to provide transportation for the pupils of these nonpublic schools it would be required to hire two additional buses at a substantial annual cost. Plaintiff contends further that unless enjoined from so doing defendants will withhold from the school district State Aid funds to which it is entitled.

The first paragraph of section 29—4 of the School Code provides:

> "The school board of any school district that provides any school bus or conveyance for transporting pupils to and from the public schools shall afford transportation, without cost, for children who attend any school other than a public school, who reside at least 1½ miles from the school attended, and who reside on or along the highway constituting the regular route of such public school bus or conveyance, such transportation to extend from the homes of such children or from some point on the regular route nearest or most easily accessible to their homes to and from the school attended, or to or from a point on such regular route which is nearest or most easily accessible to the school attended by such children."

Plaintiff contends that section 29—4 is invalid in that it violates section 3 of article X of the Illinois constitution of 1970, which provides:

> "Neither the General Assembly nor any county, city, town, township, school district, or other public corporation, shall ever make any appropriation or pay from any public fund whatever, anything in aid of any church or sectarian purpose, or to help support or sustain any school, academy, seminary, college, university, or other literary or scientific institution, controlled by any church or sectarian denomination whatever; nor shall any grant or donation of land, money, or other personal property ever be made by the State, or any such public corporation, to any church, or for any sectarian purpose."

It argues that the trial court erred in holding that under the United States Supreme Court's interpretations of the first amendment to the Federal constitution section 29—4 was constitutional, and contends that assuming, *arguendo,* that the statute does not violate the first amendment, it is invalid under the provisions of section 3 of article X of the 1970 Illinois constitution.

In reaching its decision, the circuit court relied principally upon *Everson v. Board of Education, 330 U.S. 1, 91 L. Ed. 711, 67 S. Ct. 504.* In *Everson,* a New Jersey township school board, acting under a statute which empowered it to promulgate rules and make contracts for the transportation of its pupils to and from schools, by resolution authorized reimbursement to the parents of money expended by them for the transportation of their children on regular buses operated by the public transportation system. Reimbursement was authorized and made to parents of children who attended Catholic parochial schools. The New Jersey Court of Error and Appeals, with one dissent, held that neither the statute nor the board's resolution violated either the New Jersey constitution or the first amendment. In a 5—4 decision the Supreme Court of the United States affirmed, and Mr. Justice Black,

writing for the majority, summarized the purpose and intent of the Establishment Clause as follows:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor a Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' *Reynolds v. United States, supra* [98 U.S. at 164, 25 L. Ed. 244]." 330 U.S. at 15-16, 91 L. Ed. at 723, 67 S. Ct. at 511.

The court then went on to say:

"New Jersey cannot consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans,

Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation. While we do not mean to intimate that a state could not provide transportation only to children attending public schools, we must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general State law benefits to all its citizens without regard to their religious belief.

Measured by these standards, we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools. It is undoubtedly true that children are helped to get to church schools. There is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the State. The same possibility exists where the state requires a local transit company to provide reduced fares to school children including those attending parochial schools, or where a municipally owned transportation system undertakes to carry all school children free of charge. Moreover, state-paid policemen, detailed to protect children going to and from church schools from the very real hazards of traffic, would serve much the same purpose and accomplish much the same result as state provisions intended to guarantee free trans-

portation of a kind which the state deems to be best for the school children's welfare. And parents might refuse to risk their children to the serious danger of traffic accidents going to and from parochial schools, the approaches to which were not protected by policemen. Similarly, parents might be reluctant to permit their children to attend schools which the state had cut off from such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks. Of course, cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them.

This Court has said that parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the secular educational requirements which the state has power to impose. See *Pierce v. Society of Sisters, 268 U.S. 510.* It appears that these parochial schools meet New Jersey's requirements. The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools.

The First Amendment has erected a wall

between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach. New Jersey has not breached it here." 330 U.S. at 16-18, 91 L. Ed. at 724-725, 67 S. Ct. at 512-513.

In a dissenting opinion in *Everson,* Mr. Justice Rutledge said, "Legislatures are free to make, and courts to sustain, appropriations only when it can be found that in fact they do not aid, promote, encourage or sustain religious teaching or observances, be the amount large or small. No such finding has been or could be made in this case." 330 U.S. at 52-53, 91 L. Ed. at 742, 67 S. Ct. at 529.

*Everson* demonstrates the difficulty of distinguishing legislation which provides funds for the welfare of the general public from that which aids or sustains religious institutions. In *Engel v. Vitale, 370 U.S. 421,8 L. Ed. 2d 601, 82 S. Ct. 1261,* in which the Supreme Court held that the directive of a board of education in New York which required that a prayer be said aloud at the beginning of each school day violated the first amendment, Mr. Justice Douglas, a member of the majority in *Everson* said in a concurring opinion: "My problem today would be uncomplicated but for *Everson v. Board of Education, 330 U.S. 1, 19,* which allowed taxpayers' money to be used to pay 'the bus fares of parochial school pupils as a part of a general program under which' the fares of pupils attending public and other schools were also paid. The *Everson* case seems in retrospect to be out of line with the First Amendment. Its result is appealing, as it allows aid to be given to needy children. Yet by the same token, public funds could be used to satisfy other needs of children in parochial schools—lunches, books, and tuition being obvious examples." 370 U.S. at 443, 8 L. Ed. 2d at 615, 82 S. Ct. at 1273.

In *Walz v. Tax Commission of City of New York, 397 U.S. 664, 25 L. Ed. 2d 697, 90 S. Ct. 1409,* holding valid a

New York statute exempting from real-property tax realty owned by an association organized exclusively for religious purposes and used exclusively for carrying out such purposes, Mr. Justice Douglas said in a dissenting opinion: "With all due respect the governing principle is not controlled by *Everson v. Board of Education, supra.* *Everson* involved the use of public funds to bus children to parochial as well as to public schools. Parochial schools teach religion; yet they are also educational institutions offering courses competitive with public schools. They prepare students for the professions and for activities in all walks of life. Education in the secular sense was combined with religious indoctrination at the parochial schools involved in *Everson.* Even so, the *Everson* decision was five to four and, though one of the five, I have since had grave doubts about it, because I have become convinced that grants to institutions teaching a sectarian creed violate the Establishment Clause." (397 U.S. at 703, 25 L. Ed. 2d at 721, 90 S. Ct. at 1429.) Although the Supreme Court has continued to cite *Everson* with approval (see, *e.g., Board of Education v. Allen, 392 U.S. 236, 20 L. Ed. 2d 1060, 88 S. Ct. 1923; Walz v. Tax Commission, 397 U.S. 664, 25 L. Ed. 2d 697, 90 S. Ct. 1409; Tilton v. Richardson, 403 U.S. 672, 29 L. Ed. 2d 790, 91 S. Ct. 2091*), the difficulty of the problem is further demonstrated by the statement of Mr. Chief Justice Burger, writing for the majority in *Lemon v. Kurtzman, 403 U.S. 602, 611-612, 29 L. Ed. 2d 745, 755, 91 S. Ct. 2105, 2110*: "In *Everson v. Board of Education, 330 U.S. 1 (1947),* this Court upheld a state statute that reimbursed the parents of parochial school children for bus transportation expenses. There Mr. Justice Black, writing for the majority, suggested that the decision carried to 'the verge' of forbidden territory under the Religion Clauses. *Id.,* at 16. Candor compels acknowledgement, moreover, that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law."

The same divergence of opinion expressed in *Everson* is found in the decisions of State appellate courts which have considered, under State constitutions containing prohibitions against the use of public funds for sectarian purposes, the validity of legislation authorizing the use of public funds to transport nonpublic school pupils. The courts upholding such legislation have generally adopted the rationale of the *Everson* majority opinion, while those invalidating such legislation have adopted the rationale of the dissenting opinion. States sustaining public bussing of parochial students are: California (*Bowker v. Baker* (1946), 73 Cal. App. 2d 653, 167 P.2d 256); Connecticut (*Snyder v. Town of Newtown* (1960), 147 Conn. 374, 161 A.2d 770, *appeal dismissed,* 365 U.S. 299, 5 L. Ed. 2d 688, 81 S. Ct. 692); Kentucky (*Nichols v. Henry* (1945), 301 Ky. 434, 191 S.W.2d 930; *Rawlings v. Butler* (Ky. 1956), 290 S.W.2d 801); Maine (*Squires v. Inhabitants of City of Augusta* (1959), 155 Me. 151, 153 A.2d 80 (dicta)); Maryland (*Board of Education of Baltimore County v. Wheat* (1938), 174 Md. 314, 199 A. 628 (three judges dissenting)); *Adams v. County Comm'rs of St. Mary's County* (1942), 180 Md. 550, 26 A.2d 377 (one judge dissenting); Massachusetts (*Quinn v. School Committee of Plymouth* (1955), 332 Mass. 410, 125 N.E.2d 410); Michigan (*Alexander v. Bartlett* (1968), 14 Mich. App. 177, 165 N.W.2d 445); Minnesota (*Americans United, Inc. v. Independent School District No. 622* (1970), 288 Minn. 196, 179 N.W.2d 146); New Jersey (*Everson v. Board of Education* (1945), 133 N.J.L. 350, 44 A.2d 333 (one judge dissenting), *aff'd,* 330 U.S. 1, 91 L. Ed. 711, 67 S. Ct. 504 (4 justices dissenting); *West Morris Regional Board of Education v. Sills* (1971), 58 N.J. 464, 279 A.2d 609, *cert. denied,* 404 U.S. 986, 30 L. Ed. 2d 370, 92 S. Ct. 450); New York (*Board of Education v. Allen* (1967), 20 N.Y.2d 109, 281 N.Y.S.2d 799, 228 N.E.2d 791 (3 judges dissenting), *overruling the rationale of Judd v. Board of Education* (1938), 278 N.Y. 200, 15 N.E.2d 576 (3 judges

dissenting), which until *Everson* expressed the majority view in the country that bussing parochial students was an unconstitutional aid to religion; the effect of *Judd* had been removed before *Allen,* however, by an amendment to the New York Constitution specifically permitting bussing of parochial students); Ohio (*Honohan v. Holt* (1968), 17 Ohio Misc. 57, 244 N.E.2d 537); Pennsylvania (*Rhoades v. Abington Township School Dist.* (1967), 424 Pa. 202, 226 A.2d 53 (two judges dissenting), *appeal dismissed,* 389 U.S. 11, 19 L. Ed. 2d 7, 88 S. Ct. 61); and West Virginia (*State ex rel. Hughes v. Board of Education* (W. Va. 1970), 174 S.E.2d 711 (2 judges dissenting).) Those States which have invalidated such legislation are: Alaska (*Matthews v. Quinton* (Alas. 1961), 362 P.2d 932 (one judge dissenting)); Delaware (*State ex rel. Traub v. Brown* (1934), 36 Del. 181, 172 A. 835, *Opinion of the Justices* (Del. 1966), 216 A.2d 668); Hawaii (*Spears v. Honda,* 51 Hawaii 1, 449 P.2d 130); Idaho (*Epeldi v. Engelking* (1971), 94 Idaho 390, 488 P.2d 860 (2 judges dissenting)); Oklahoma (*Board of Education v. Antone* (Okla. 1963), 384 P.2d 911); Washington (*Visser v. Nooksack Valley School District* (1949), 33 Wash. 2d 699, 207 P.2d 198 (2 judges dissenting)); and Wisconsin (*State ex rel. Reynolds v. Nusbaum* (1962), 17 Wis. 2d 148, 115 N.W.2d 761 (2 judges dissenting)). It appears that while there is unanimity neither among the courts nor their respective judges, the majority view and the trend of judicial opinion is that transportation at public expense of parochial school students on the same basis as public school students is considered primarily a health-and-safety measure for the benefit of all students, and that any aid to the parochial school, or the church supporting it, is incidental.

In their brief, defendants, citing statistics and highway safety reports, assert that travel by school bus is safer than by automobile or on foot, that children traveling by school bus are protected from inclement weather and from persons who might do them harm, and argue that section

29—4 is a health-and-safety measure for the protection of all school children. Plaintiff, on the other hand, argues that the transportation of parochial school students is a benefit and constitutes assistance to church-controlled schools, that the "child benefit" theory advocated by defendants is a subterfuge to circumvent the constitution, and that aid to a religion-oriented school is tantamount to assisting the church which controls that school. From our examination of the authorities we conclude that section 29—4 was enacted for the secular legislative purpose of protecting the health and safety of children traveling to and from nonpublic schools; that the primary effect of the statute neither advances nor inhibits religion, that any benefit to the parochial school or church controlling it is incidental and that the statute does not foster an excessive government entanglement with religion.

Plaintiff contends that section 3 of article X of the 1970 Illinois constitution is more restrictive than the establishment-of-religion clause of the first amendment and prohibits even incidental aid or benefits to sectarian schools. In support of its contention plaintiff argues that the language of section 3 of article X is identical to that of section 3 of article VIII of the 1870 Illinois constitution, and that both the 1870 and 1970 constitutional conventions rejected efforts to amend it or replace it with a provision similar to the religion clause of the first amendment. 2 Debates of Constitutional Convention 1869-70, at 626; 2 Record of Proceedings, Sixth Illinois Constitutional Convention 841-854 [hereinafter cited as Proceedings].

In *People ex rel. Keenan v. McGuane, 13 Ill.2d 520, 527,* this court stated: "While in construing the constitution the true inquiry concerns the understanding of the meaning of its provisions by the voters who adopted it, still the practice of consulting the debates of the members of the convention which framed the constitution has long been indulged in by courts in determining the meaning of

provisions which are thought to be doubtful." In our opinion the Record of Proceedings of the Sixth Illinois Constitutional Convention indicates that the language of section 3 of article X was retained from the 1870 constitution in order to maintain the existing detente that had developed between the State and nonpublic schools.

The Committee on Education in its Proposal Number 1 (6 Proceedings 223-289) recommended that section 3 of article VIII of the 1870 constitution be retained as a part of the new constitution. The explanation in the committee proposal and appendices to the proposal show the depth of the committee's study, its interpretation of the provision prohibiting public funds for sectarian purposes and its reasons for retaining the provision from the 1870 constitution. The committee stated:

> "It is the intention of the Education Committee by retaining this language to reaffirm the traditional principle of the separation of church and state as expressed in the 1870 Constitution and as expressed by the Federal First Amendment which prohibits any 'law respecting an establishment of religion'.
>
> \* \* \*
>
> The Committee heard almost a hundred witnesses testify regarding ARTICLE VIII, Section 3. In brief, there are five possible approaches to this question as suggested by the witnesses, by delegate proposals and as considered by the Committee:
>
> 1. The first alternative would strengthen the language of Section 3 to make such language more prohibitive of various types of payments which might be considered in aid of nonpublic schools. Some witnesses requested greater restriction, but virtually no one submitted any specific language which would be more restrictive. None of the member proposals presented this alternative. The Committee recognizes that language which is more restrictive might tend to invalidate programs now in effect. Such programs are the Illinois State Scholarship program, pupil transportation, the school lunch program, aid to handicapped children and industrial and training school programs among others. More restrictive language could be drafted which might entirely prohibit the State

from doing business with any private entity. Having no desire to retard or eliminate such established programs, nor to venture into unexamined areas of restriction where the effects could go far beyond education, the Committee rejected this alternative.

The remaining four alternatives are as follows:

2. To amend the present language to make specific types of aid to non-public schools more permissible (Member Proposals Nos. 90, 91, 253, 285).

3. To substitute the wording of the Federal First Amendment prohibiting any 'law respecting an establishment of religion'.

4. To strike the section in its entirety and remain silent on the question (Member Proposals Nos. 101, 152, 192, 544).

5. To retain the present language unchanged (Member Proposal No. 204).

It is possible to consider these four alternatives as a group because, as legal experts have testified before the Committee, the same substantive results would accrue from each of the four choices. No matter what the wording of the Illinois Constitution, no legislative program of assistance to private schools or pupils, direct or indirect, can be carried out if such program violates the Federal First Amendment. As a practical matter then, neither the present Section 3, nor silence on the subject, nor more permissive language can effectively allow any program which violates the Federal prohibition, since such a program is voidable by the Federal courts. Therefore, to change the Illinois language in accordance with alternatives 2, 3, or 4 can make a practical, substantive difference only if the standard of the present Illinois Section 3 is a more restrictive standard than the Federal 'establishment' clause.

The Committee is of the opinion that the Illinois Supreme Court in the cases of *Dunn v. Chicago Industrial School For Girls*, 280 Ill. 613 (1917); *Trost v. Ketteler Manual Training School*, 282 Ill. 504 (1918); and, *St. Hedwig's Industrial School for Girls v. Cook County*, 289 Ill. 432 (1919), has interpreted the words 'aid', 'support or sustain', and 'sectarian purpose' to yield the same results as the United States Supreme Court's interpretation of the word 'establish' in the Federal First Amendment. In addition, since the testimony of legal authorities

(and see *Braden* and *Cohn*, p. 409), has indicated that the present language is no more restrictive than the Federal language but rather yields the same substantive results, the Committee has concluded that any program which is constitutional under the Federal 'establishment' clause is constitutional under the present wording of ARTICLE VIII, Section 3.

In the cases of *Everson v. Board of Education,* and *Board of Education v. Allen,* 392 U.S. 236 (1968), the U.S. Supreme Court held, as did the New York Court of Appeals in the *Allen* case, that, as a matter of law, religious and secular ends can be separated. In recommending the retention of Section 3 as is, the Committee has recognized the possibility of this separation. Whether any particular program constitutes 'aid' or 'support' for prohibited sectarian purposes or is in furtherance of nonsectarian purposes is a factual matter to be left to court determination.

The Committee thus decided to follow the recommendation of the overwhelming majority of the witnesses which was to retain Section 3 without change. The depth of emotion underlying much of the testimony has further convinced the Committee that any change, even one that is not substantive, would be unwise.

The New York experience is particularly relevant. In New York, the Constitutional Convention substituted the Federal First Amendment language for a section similar to Section 3 in Illinois. It is generally agreed, that the resulting controversy over what appeared, probably erroneously, to be the allowance of greater aid led to the defeat of the entire New York Constitution. Ironically, the New York Legislature then passed the textbook loan program which was upheld in the *Allen* case, under both the New York and the Federal Constitutions." 6 Proceedings 249-254.

We conclude that the opinion expressed by the Committee on Education with respect to section 3 of article X was also the understanding of the convention (see 2 Proceedings 841-854) and of the voters who adopted it. Section 29—4 was enacted in 1933 (Laws of 1933, p. 1048), and when the voters approved the

constitution of 1970, the bussing of nonpublic students at public expense was a well-recognized and long-established practice. "This is an instance where *** the history of past practices is determinative of the meaning of a constitutional clause, not a decorous introduction to the study of its text." (Mr. Justice Reed, dissenting in *People ex rel. McCollum v. Board of Education,* 333 U.S. 203, 256, 92 L. Ed. 2d 649, 682, 68 S.Ct. 461, 487.) We hold that section 29—4 of the School Code of 1961 does not violate section 3 of article X of the 1970 Illinois constitution.

Plaintiff contends next that in providing for free transportation to pupils attending church-controlled schools, section 29—4 gives a preference to the controlling church in violation of section 3 of article I of the 1970 constitution, which in pertinent part provides: "No person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship." Plaintiff asserts that in Illinois approximately 88% of the elementary and 95% of the secondary school children attending nonpublic schools are enrolled in Catholic schools. It argues that the chief beneficiaries of section 29—4 are the Catholic schools and that this constitutes the granting of a preference to the Catholic Church, which controls these schools.

Section 3 of article I of the 1970 constitution is identical to section 3 of article II of the 1870 constitution. The Bill of Rights Committee, which voted 13 to 0 with 2 absent to retain this section, stated: "The Committee was persuaded that it would be inadvisable to make any change in this important and sensitive provision. The Committee heard many witnesses on this subject. Most spoke to the advisability or inadvisability of government aid to parochial and other private schools, a question that is primarily in the hands of the Education Committee. (See Article VIII, Sec. 3 of the 1870 Constitution.)" (6

Proceedings 21.) The position taken by the Bill of Rights Committee was also the position taken by the convention. See 3 Proceedings 1372.

The same secular purpose, primary neutral effect and absence of excessive government entanglement which place section 29—4 outside the prohibition of section 3 of article X against the use of public funds for sectarian purposes also place it outside the prohibition of section 3 of article I against any preference being given by law to any religious denomination. Section 29—4 does not violate section 3 of article I of the 1970 Illinois constitution.

Citing *Schuler v. Board of Education, 370 Ill. 107,* plaintiff contends next that section 29—4 violates section 1(a) of article VIII of the 1970 Illinois constitution, which provides: "Public funds, property or credit shall be used only for public purposes." Plaintiff asserts that the bussing of nonpublic school children by a public school district constitutes the use of public funds for a private purpose. The obvious answer to this contention in view of what we have heretofore said is that the transportation of school children, public or nonpublic, is a public purpose. *Schuler* is easily distinguishable. That case involved a contract between a public high school and a private junior college whereby the high school would purchase books and laboratory equipment for the joint use of the high school and junior college students. The court found that the transaction was a loan of public credit and property to a private corporation in violation of section 20 of article IV and separate section 2 of the 1870 Illinois constitution, neither of which appears in the 1970 Illinois constitution. The bussing of nonpublic school students is not a loan of public credit or property to the private schools, and we hold that section 29—4 does not violate section 1(a) of article VIII of the 1970 Illinois constitution.

Finally, plaintiff contends that section 29—4 violates section 13 of article IV of the 1970 Illinois constitution, which provides: "The General Assembly shall pass no

special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." The substance of plaintiff's argument is that section 29—4 will not operate uniformly as to all nonpublic school pupils, and will result in discrimination as to many of them because of the great differences and many variations in the locations of public schools, nonpublic schools, the regular public school routes and the distances between the pupils' homes and the regular bus routes and the schools, both public and nonpublic. Obviously, plaintiff is not a member of the class of nonpublic school pupils against whom it contends the statute is unreasonably discriminatory and is without standing to question the validity of the statute on this ground. *Rosewood Corp. v. Fisher, 46 Ill.2d 249, 259; Schreiber v. County Board of School Trustees of Peoria County, 31 Ill.2d 121, 125; Chicago Cosmetic Co. v. City of Chicago, 374 Ill. 384, 394.*

The circuit court correctly held section 29—4 to be constitutional, and the judgment dismissing plaintiff's action is affirmed.

Plaintiff's second action for declaratory judgment (No. 45242) arose from the same factual situation and controversy as did the first. In this case it challenged the constitutionality of those sections of the School Code (Ill. Rev. Stat. 1971, ch. 122, par. 1—1 *et seq.*) which authorized the Superintendent of Public Instruction

"To be the legal adviser of school officers, and, when requested by any school officer, to give his opinion in writing upon any question arising under the school laws of the State" (par. 2—3.7)

and

"To hear and determine all controversies arising under the school laws of the State, coming to him by appeal from a county superintendent of schools" (par. 2—3.8)

and which provides:

> "In all controversies arising under the school law, the opinion and advice of the county superintendent shall first be sought, whence appeal may be taken upon a written statement of facts certified by the county superintendent to the Superintendent of Public Instruction " (par. 3—10)

and that the County Superintendent of Schools is

> "To act as the official adviser and assistant of the school officers and teachers in his county. In the performance of this duty he shall carry out the advice of the Superintendent of Public Instruction." (Par. 3—14.7)

It has been the practice of the Office of the Superintendent of Public Instruction to give written opinions on questions arising under the School Code. The opinions are written on the stationery of the Office of the Superintendent of Public Instruction and are signed by the legal adviser, who is an attorney at law, or one of eight assistant legal advisers, all of whom are attorneys. The Superintendent of Public Instruction is not an attorney. In reply to a letter written by counsel for plaintiff, an opinion was furnished plaintiff with respect to its duties under the provisions of 29—4. Plaintiff, acting upon the advice of its attorney, declined to act in accordance with the opinion of the Office of the Superintendent of Public Instruction, the Superintendent of Public Instruction ordered certain funds withheld, and this litigation was instituted.

It is plaintiff's contention that the General Assembly cannot constitutionally authorize either the Superintendent of Public Instruction or County Superintendent of Schools to act as legal adviser to school officials throughout the State or to render opinions concerning school law. It contends further that only the judicial branch of government is vested with the power to define and regulate the practice of law; that the Superintendent of Public Instruction is not an attorney licensed by this court and that he may not use the services of licensed attorneys to engage in the practice of law; that the rendition of

opinions on questions of school law constitutes the practice of law; that the authorization of the Superintendent of Public Instruction to act as legal adviser and give written opinions on questions of school law to school officers violates section 1 of article II of the Illinois constitution of 1970, which provides for the separation of powers among the legislative, executive and judicial branches of government; and that the authorization to hear and determine controversies arising under the school laws was an unconstitutional delegation of judicial power.

The legislation authorizing the Superintendent of Public Instruction to interpret the school laws was enacted in 1857 and provided:

> "The said state superintendent of public instruction shall make such rules and regulations as he may think necessary and expedient to carry into full effect the provisions of this act, and of all the laws which now are or may hereafter be in force for establishing and maintaining schools in this state; and the said superintendent shall have power, and it shall be his duty, to explain and interpret and determine to all school commissioners, directors, township and other school officers, the true intent and meaning of this act, and their several duties enjoined thereby, and his decision shall be final, unless otherwise directed by the legislature, or reversed by a court of competent jurisdiction." Laws of 1857, p. 259-260.

In 1871 this section was amended to provide:

> "The said state superintendent of public instruction shall make such rules and regulations as may be necessary and expedient to carry into efficient and uniform effect the provisions of this act, and of all the laws which now are or may hereafter be in force for establishing and maintaining free schools in this state; and shall be the legal adviser of all school officers, and when requested by any such school officer, shall give his opinion in writing upon any question arising under the school laws of this state." Laws of 1871, p. 702.

The validity of this statutory provision, amended to substantially its present form in 1915, and virtually

unchanged in several revisions of the School Code, does not appear to have been previously questioned.

In support of its contention that the Superintendent of Public Instruction cannot be authorized to give advisory opinions to school officials on questions arising under the school law, plaintiff relies principally upon *Stein v. Howlett, 52 Ill.2d 570,* which involved the constitutionality of the Governmental Ethics Act (Ill. Rev. Stat., 1972 Supp., ch. 127, par. 601—103 *et seq.*). Section 4A—106 (par. 604A—106) of that Act authorized the Secretary of State, upon request of any person subject to the Act, to render an advisory written opinion on questions concerning the interpretation of article 4A and authorized him to employ counsel to carry out this duty. Under the authority of *Fergus v. Russel, 270 Ill. 304,* we held this section unconstitutional.

In *Fergus,* the court held that the constitution clothed the Attorney General with all the common-law powers of that office, and although the General Assembly may impose new duties upon him, it cannot take from him any of his common-law powers or duties. One of his common-law duties is to act as "the sole official adviser of the executive officers and of all boards, commissions and departments of the State Government" (270 Ill. at 342), and section 4A—106 of the Governmental Ethics Act was held unconstitutional for the reason that it would have permitted the Secretary of State to act as legal adviser to other executive officers who were subject to the Governmental Ethics Act. *Stein* is clearly distinguishable for the reason that the school officers who receive legal advice from the Office of the Superintendent of Public Instruction are not executive officers, boards, commissions or departments of the State government whose legal adviser or representative must be the Attorney General. (*People ex rel. Board of Trustees of U. of I. v. Barrett, 382 Ill. 321.*) We hold, therefore, that section 2—3.7 of the School Code does not purport to take from the Attorney General any

of his common-law duties or powers and does not violate the constitution of 1970. We hold further that in utilizing the services of licensed attorneys as legal advisers, to perform the duties imposed upon him under section 2—3.7, the Superintendent of Public Instruction is not engaged in the unauthorized practice of law.

We consider next plaintiff's contention that in authorizing the Superintendent of Public Instruction "to hear and determine all controversies" section 2—3.8, in violation of the provision of section 1 of article II of the constitution of 1970, provides for an unconstitutional delegation of judicial power. Included in the powers and duties of the Superintendent of Public Instruction enumerated in section 2—3 of the School Code are many administrative duties. An officer charged with administrative duties may properly be granted such quasi-judicial powers as are necessary and incidental to those duties. (*Department of Finance v. Cohen, 369 Ill. 510*); and the authorization of such powers is not an unconstitutional grant of judicial power. (*Toplis and Harding, Inc. v. Murphy, 384 Ill. 463.*) The School Code provides for Administrative Review (Ill. Rev. Stat. 1971, ch. 110, par. 264 *et seq.*) of many of the decisions of the Superintendent of Public Instruction, and where administrative review is not available, as demonstrated in this case, judicial review may be invoked by way of an action for declaratory judgment. We hold that section 2—3.8 is not an unconstitutional delegation of judicial power.

We consider next plaintiff's contentions with respect to section 3—10. Despite the language of that section, an examination of the School Code shows that there are many controversies, such as those involving boundary changes, in which the County Board of School Trustees has primary jurisdiction (art. 7, ch. 122, par. 7—1 *et seq.*), and dismissal of teachers in contractual continued service (ch. 122, par 24—12) in which primary jurisdiction lies in the school boards, both with provisions for administrative

review (see sections 7—7 and 24—16), which obviously are not governed by the provisions of section 3—10. Presumably there are situations to which section 3—10 is applicable, but none is presented in this case and we need not, therefore, determine its validity. Nor does this record present a factual situation which requires us to determine the validity of section 3—14.7.

Finally we consider plaintiff's contention that in taking the position that it must be governed by his interpretation of the school law, rather than by the opinion of its own attorneys, the Superintendent of Public Instruction has improperly interfered with its powers and duties in the administration of the school district which it governs and has unlawfully, under threat of withdrawal of recognition and withholding of funds, sought to force it to accede to his views.

Clearly the Superintendent of Public Instruction in the performance of his duties must determine factual situations and apply the controlling law to those facts, and that is precisely what was done here. The Superintendent of Public Instruction concluded that plaintiff was not in compliance with section 29—4, and the sanction of having funds withheld was imposed, not, as suggested by plaintiff because of its refusal to comply with the legal opinion of the Superintendent of Public Instruction, but because of its violation of section 29—4. The fact that plaintiff could bring these actions for declaratory judgment and injunction demonstrates that a remedy is available to school officers who disagree with the opinions of the Office of the Superintendent of Public Instruction. We conclude that the trial court correctly dismissed plaintiff's actions, and the judgments are affirmed.

*Judgments affirmed.*

MR. JUSTICE RYAN, specially concurring:

I agree with the result reached by my colleagues. However, I would not reach the result by equating the

provisions of section 3 of article X of the 1970 constitution with the first amendment of the Federal constitution. The opinion states that the majority view in other jurisdictions holds that the transportation of pupils is considered primarily a health and safety measure for the benefit of the students and that any aid to parochial schools as a result of such transportation is only incidental. On this basis I would uphold the statute in question. This has been the basis upon which other States which have constitutional language as restrictive as that contained in our section 3 of article X have sustained statutes providing transportation to students in parochial schools. (See Annot., 41 A.L.R.3d 344.) These other jurisdictions have not upheld such statutes by holding that the restrictive language of their constitutions conveys the same meaning as do the provisions of the first amendment of the Federal constitution.

Clearly it was not the intention of the delegates to the constitutional convention of 1870 that the language of section 3 of article VIII of the constitution of 1870 (which language is identical with that of section 3 of article X of the 1970 constitution) should have the same meaning as the first amendment. The Illinois constitutions of 1818 and 1848 did not contain provisions similar to those found in section 3 of article VIII of the constitution of 1870. However, each of those previous documents did contain a general clause relating to religion similar to that contained in the first amendment. Likewise, in the constitution of 1870 a similar general provision was incorporated in section 3 of article II, which provided: "The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever be guaranteed; ***. No person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship."

However, the delegates to the 1870 convention were

not satisfied with this general prohibition against supporting or giving preference to any religious denomination. The debates reflect a great concern over aid to sectarian schools, apparently because of some experience in the State of New York. Resolutions were presented to the convention requesting that there be incorporated in the constitution specific prohibitions against the use of public funds for the support of sectarian schools. (1 Debates and Proceedings of the Constitutional Convention of 1870, at 85, 118, 127.) There was submitted to the convention a proposed section which ultimately became section 3 of article VIII. During the debate on this section Delegate Church, in replying to a proposed amendment to the section, stated: "Now the intention of the committee was to make that section so broad and distinct that no appropriations could be made in aid of any of those objects that are mentioned. *** there are various pretexts that might be got up to give aid to them by indirection, if the amendment should be adopted." The amendment was rejected. 1 Debates and Proceedings of the Constitutional Convention of 1870, at 617.

During the course of debate the following substitute for the proposed section was offered and rejected by the convention: "The General Assembly shall pass no law for the establishment of religion or prohibiting the free exercise thereof." (1 Debates and Proceedings of the Constitutional Convention of 1870, at 626.) The almost identical language of this proposed substitute with that contained in the first amendment of the Federal constitution suggests its source. Its rejection as a substitute for section 3 of article VIII indicates to me that the framers of the constitution of 1870 did not intend that this section have the same meaning as the first amendment but that it be more restrictive insofar as public aid to sectarian schools is concerned.

Thus, the constitution of 1870 as finally adopted had two sections concerning church-state relationship: the

general religion clause found in section 3 of article II, which has been quoted above and is similar to the prohibitions and protections afforded by the first amendment, and the specific prohibitions against public aid to sectarian schools as contained in section 3 of article VIII of the constitution of 1870. The provisions of this section are:

> "Neither the general assembly nor any county, city, town, township, school district, or other public corporation, shall ever make any appropriation or pay from any public fund whatever, anything in aid of any church or sectarian purpose, or to help support or sustain any school, academy, seminary, college, university, or other literary or scientific institution, controlled by any church or sectarian denomination whatever; nor shall any grant or donation of land, money, or other personal property ever be made by the state or any such public corporation, to any church, or for any sectarian purpose."

These two provisions in the constitution of 1870, considered with the fact that the convention specifically rejected the language of the first amendment when offered as a substitute for the language of section 3 of article VIII, indicate to me that it was the intention of the framers of the constitution of 1870 that the specific prohibitions of section 3 of article VIII should be more restrictive with regard to public aid to sectarian schools than are the general prohibitions of the first amendment.

In the 1970 constitution section 3 of article I is identical to section 3 of article II of the constitution of 1870, and section 3 of article X is identical to section 3 of article VIII of the constitution of 1870. Thus in the constitution of 1970, as in the constitution of 1870, we have the general prohibitions similar to those found in the first amendment and the specific prohibition against aid to sectarian schools.

The majority opinion indicates that somehow between 1870 and 1970 all of the specific proscriptions of section 3 of article X of the 1970 constitution have become verbiage

and have come to mean nothing more than "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof"—the provisions of the first amendment of the Federal constitution. The opinion quotes extensively from the constitutional debates of 1970, citing these debates as an indication of the intention of the delegates that the meaning of section 3 of article X should be the same as the provisions of the first amendment. To me the quoted portions of the debates do not indicate this. Rather, I view the language of the debates as acknowledging that this subject was a controversial issue which the delegates were reluctant to face. They rejected the substitution of the language of the first amendment for the language of section 3 of article VIII of the constitution of 1870, fearing that this substitution would antagonize a large section of the electorate. The only intention that I can glean from the debates is that the convention attempted to sidestep the issue and to lead the electorate to believe that the specific prohibitions contained in section 3 of article X mean what the language of that section clearly states, while at the same time hoping that this court at some future date will extend the dicta found in *Dunn v. Chicago Industrial School for Girls (1917), 280 Ill. 613,* and say that this language means no more than the first amendment.

This questionable scheme was furthered by the official explanation which the convention adopted for the information of the voters (see Proposed 1970 Constitution— Official Text with Explanation, 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2742). If it was the intention of the delegates that this section have the same meaning as the first amendment, why did they not say this in the explanation of this section? Instead, the official explanation states: "This is exactly the same as Article VIII, Section 3 of the 1870 Constitution."

Would a voter, after having read this explanation and before casting his vote for or against the proposed

constitution, think that the specific and detailed prohibitions of section 3 of article X were no more restrictive than the general prohibitions of the first amendment? I believe he would not. It was the vote of the People which was required to bring this constitution into existence. I am therefore concerned only with what the voters intended when they voted for the adoption of the constitution, and that intent must be gathered from the clear and specific language of the instrument. I am not concerned with the intent of the delegates to the convention, because I fear that their intention was to evade this controversial issue and to be less than candid with the electorate.

I do not believe that the meaning of section 3 of article X of the constitution of 1970 can be forever tied to the construction which has been or which may be placed upon the general language of the first amendment of the Federal constitution. The divergent language used in these two provisions inevitably will lead to a result which will conflict with a specific prohibition of section 3 of article X. Only recently (June 25, 1973) the Supreme Court of the United States in *Norwood v. Harrison*, —— *U.S.* ——, ——, *37 L. Ed. 2d 723, 730, 93 S. Ct. 2804, 2810,* stated:

> "Free textbooks, like tuition grants directed to private school students, are a form of financial assistance inuring to the benefit of the private schools themselves. An inescapable educational cost for students in both public and private schools is the expense of providing all necessary learning materials. When, as here, that necessary expense is borne by the State, the economic consequence is to give aid to the enterprise; ***."

From this language I conclude that furnishing textbooks to students attending parochial schools would constitute a violation of the prohibition of section 3 of article X of our constitution, which proscribes appropriating or paying anything to help support or sustain any

school controlled by any church. Yet, under the first amendment the Supreme Court has held that the furnishing of textbooks to students is permissible. *Board of Education v. Allen, 392 U.S. 236, 20 L. Ed. 2d 1060, 88 S. Ct. 1923.*

This different result is possible because not only does section 3 of article X of our constitution prohibit the payment of anything the primary effect of which is to advance religion, as does the first amendment, but it also specifically prohibits any appropriation or payment to help support or sustain a school controlled by a church, whether or not the effect of that payment is to advance religion. Thus, any payment that helps support or sustain such a school would be in violation of the Illinois constitution whereas it may be proper under the first amendment because it does not constitute a payment advancing religion. There are many forms of aid to parochial schools which may ultimately be construed as not advancing religion and thus not in violation of the first amendment. However, unless the last two thirds of article X is ignored such aid to a school controlled by a church would be contrary to the specific prohibitions of the Illinois constitution.

For these reasons, I cannot agree that section 3 of article X of the constitution of 1970 is no more restrictive than the first amendment of the Federal constitution.