THE VILLAGE OF SHERMAN, Plaintiff-Appellant, *v.* THE VILLAGE OF WILLIAMSVILLE *et al.*, Defendants-Appellees.

Fourth District    No. 17406

Opinion filed May 12, 1982.—Rehearing denied June 7, 1982.

Paul E. Presney and James D. Kelly, both of Presney, Huffman, Kelly & Appleton, of Springfield, for appellant.

Barber, Hall, Segatto & Hoffee, of Springfield (Carl O. Hoffee, of counsel), for appellee Village of Williamsville.

Fred Prillaman, of Mohan, Alewelt & Prillaman, of Springfield, for appellee Williamsville-Sherman Water Commission.

JUSTICE MILLS delivered the opinion of the court:

A water contract for the benefit of two neighboring municipalities—Williamsville and Sherman.

Now Sherman seeks to renege.

The trial court held it can't.

We agree.

It is necessary to recount the background of this case in somewhat tiresome detail. Williamsville has always been the exclusive seller and distributor of water to Sherman. Even before Sherman was incorporated in 1958, Williamsville was providing water to customers in that area. Originally the water source for the Williamsville distribution system was a well in Williamsville. But as the villages grew their demand for water increased and a new source of water was needed. The villages created the Williamsville-Sherman Water Commission (the Commission) pursuant to section 11—135—1 et seq. of the Illinois Municipal Code. (Ill. Rev. Stat. 1979, ch. 24, par. 11—135—1 et seq.) The purpose of the Commission was to obtain water from Springfield and to finance the construction of facilities to transport and store the Springfield water.

In connection with acquiring the new water supply, an agreement

dated August 17, 1971, was entered into by the Commission and the villages of Williamsville and Sherman (hereinafter referred to as the 1971 Contract). Pursuant to this agreement, Williamsville was to buy all of the water the Commission purchased from Springfield. The Commission was to be the exclusive supplier of water to Williamsville during the time any of the Commission's bonds remained unpaid, and Williamsville was to be the exclusive supplier of water in Sherman. This agreement expires on November 1, 2011, and provides for annual extensions thereafter.

The agreement was modified on June 6, 1972, in part to relieve Sherman of the immediate obligation to construct a water tower upon the payment of $25,000 to the Commission, but obligating Sherman to construct a tower at its own expense if one should ever be required in the Sherman area. The $25,000 payment was to be applied by the Commission to reduce outstanding bond indebtedness. In addition, the original agreement was amended to provide that Williamsville would be the exclusive distributor of water within Sherman for the entire term of the base agreement instead of being the exclusive supplier only during the period in which the Commission had outstanding revenue bonds.

On August 31, 1971, the Commission, Williamsville, Sherman, and the City of Springfield entered into a written agreement pursuant to which Springfield agreed to sell water to the Commission. This agreement also expires on November 1, 2011. During the 40-year period of this agreement, Springfield is to be the exclusive supplier of water to the Commission. Under the agreement, Williamsville agrees to provide minimum storage facilities equal to at least one day's water usage.

Thereafter, a 10-inch water transmission line from the north edge of Springfield to Sherman was constructed along with other facilities. The transmission line connecting the Williamsville system to Springfield provides a capacity of one million gallons per day, substantially in excess of the minimum needs in 1971 of the customers of the Williamsville distribution system. The excess capacity was to provide for future development in the Williamsville and Sherman areas. In order to recover a portion of the cost of this excess capacity, the Commission, Williamsville, and Sherman entered into an agreement providing for a water development fee. Under this agreement, developers are required to pay a fee of $200 per apartment in a multi-family development, $200 per residential lot, and $400 per single commercial development up to a 3/4-inch tap.

From August of 1971 to the present time, Sherman has experienced rapid growth. Several new developments have been proposed and constructed in Sherman since 1971. One proposed project, which never reached the construction stage, was a racetrack development known as Lincoln Land Downs. The only contact Williamsville had with this project

was a letter sent from Lee Miller, Williamsville's president, to the secretary-treasurer of the project in response to an inquiry as to whether Williamsville would sue the project if it acquired its own water supply.

Sherwood Zimmerman, the president of Sherman, testified that developers in the Sherman area have had difficulties regarding water extension application denials. He cited two specific examples: projects known as Villa Vianny and The Rail. Sherman had determined that Villa Vianny was a commercial project, not a multi-family project and therefore a single commercial tap and water development fee should have been applicable. Williamsville considered the development a multifamily project and suggested a revised application with a larger tap fee and development fee. With respect to The Rail development, Mr. Zimmerman's testimony indicated that the developer's plans were yet to be ascertained. At one time the developer was going to develop a series of single-family condominiums and sought a single tap; however, this plan was changed.

Williamsville declared a *moratorium* on water main extensions throughout the water distribution system from December 1977 to March 1978. This was due in part to the fact that the system's storage facilities were inadequate under the Springfield contract which required Williamsville to provide minimum storage facilities and the fact that Springfield had threatened to institute legal proceedings to assure compliance with the minimum storage requirements.

To finance proposed improvements in its water and sewer systems, Williamsville passed Ordinance 80-11 which provided for an increase in water rates. This rate increase was found to be excessive and was later reduced. No refund was made to customers with respect to the excessive rates and the revenues generated by the rate increase were not deposited in segregated accounts.

Sherman filed its complaint on February 1, 1980. Count I sought recision of the agreements in question because of Williamsville's alleged breach of its duty to supply water to all Sherman customers; count II sought an accounting for all revenue generated by the water distribution system; count III requested an injunction against the issuance of bonds pursuant to Ordinance 80-11; count IV was a request for a declaratory judgment invalidating the water main extension contract used by Williamsville; and count V prayed for a declaratory judgment stating that the increased water rates were in violation of the 1971 Contract and that any water storage facility built pursuant to the contract was to be owned and operated by the Commission. The complaint was later amended to add counts VI through VIII. Count VI requested that a declaratory judgment be entered stating that the 1971 Contract was void or voidable for failure

to conform with the provisions and requirements of section 11—135—1 *et seq.* of the Municipal Code; count VII alleged the agreement was void or voidable because it constituted an impermissible delegation and abrogation of sovereignty and the police powers of Sherman; and count VIII alleged invalidity because there was insufficient consideration for the amendment of June 6, 1971.

At the close of Sherman's evidence, Williamsville made a motion to dismiss all counts of Sherman's complaint. The trial court granted Williamsville's motion with respect to counts I, IV, V, VI, VII, and VIII, and with respect to part of count III. The court ruled that Sherman had made a *prima facie* showing of its right to an accounting under count II of the complaint. Williamsville does not contest this ruling.

## I

Williamsville, Sherman, and the Commission entered into a contract for the distribution and sale of water. Sherman now disputes the powers of these three municipalities to enter into, and act pursuant to, this contract.

Article VII, section 10, of the 1970 Illinois Constitution has conferred broad power on municipalities regarding intergovernmental agreements. It provides:

> "Units of local government * * * may contract or otherwise associate among themselves * * * to obtain or share services and to exercise, combine, or transfer any power or function, in any manner not prohibited by law or by ordinance."

Under paragraph (c) of section 10, the State is directed to encourage intergovernmental cooperation. Ill. Const. 1970, art. VII, sec. 10(c).

■■ When discerning the purpose of constitutional provisions, the Illinois Supreme Court has attached great weight to the Record of Proceedings of the Constitutional Convention. (See *Board of Education v. Bakalis* (1973), 54 Ill. 2d 448, 299 N.E.2d 737.) Excerpts from the proceedings of the Constitutional Convention reveal the intended purpose and effect of article VII, section 10:

> "It permits smaller units of local government, by combining to perform specific services or functions, to develop economies of scale with resultant cast [*sic*] reductions.
>
> We think, in the long run, that vigorous intergovernmental cooperation will reduce the need for special districts and will permit the provision of services which no single unit can provide." 4 Record of Proceedings, Sixth Illinois Constitutional Convention 3421 (hereinafter cited as Proceedings).
>
> "You will notice that the language of the intergovernmental coop-

eration article is based upon an affirmative grant of self-executing power \* \* \* which, in essence, means that it's there unless it's prohibited by the General Assembly—by general law. So it's a provision that says, 'You can do it unless the General Assembly says you can't.' " 4 Proceedings 3426.

Article VII, section 10, eliminated the effect of "Dillon's Rule" in construing intergovernmental agreements. This rule limited the powers of a municipal corporation to those expressly granted or incident to powers expressly granted by the General Assembly. The rule resolved any doubt of the existence of a power against the municipality. (*Elsenau v. City of Chicago* (1929), 334 Ill. 78, 165 N.E. 129.) The various divisions of our court have determined that article VII was intended to encourage cooperation among units of government and to remove the necessity of obtaining statutory authorization for cooperative ventures. (*Village of Elmwood Park v. Forest Preserve* (1974), 21 Ill. App. 3d 597, 316 N.E.2d 140.) Furthermore, this court has stated that article VII, section 10, has abrogated Dillon's Rule of strictly construing legislative grants of authority to local governmental units. *Connelly v. County of Clark* (1973), 16 Ill. App. 3d 947, 307 N.E.2d 128.

■■ The 1971 Contract seems to be just the type of agreement contemplated by article VII. Williamsville and Sherman needed water. The Commission was created to buy water from Springfield and construct facilities to transport the water to the Williamsville distribution system. The 1971 Contract defines the terms under which Williamsville was to obtain water from the Commission. It appears highly unlikely that Sherman would have ever been able to provide water to its residents without the cooperation of Williamsville and the Commission. This is clearly a case of "units of local government \* \* \* contract[ing] \* \* \* to obtain or share services." No statutory authority was necessary to authorize this contract and Sherman has cited no statutes that prohibit such a contract.

Sherman does not dispute that article VII empowered the parties to enter into this agreement. Rather, Sherman argues that the parties never intended to rely on article VII. It maintains that the parties intended the entire water distribution system to be operated within the framework of section 11—135—1 *et seq.* of the Illinois Municipal Code. (Ill. Rev. Stat. 1979, ch. 24, par. 11—135—1 *et seq.*) Sherman then asserts that section 11—135—1 *et seq.* do not authorize the 1971 Contract.

Sherman has not established that the parties intended to restrict their powers to those expressed in the Municipal Code. The 1971 Contract makes no reference to the Code. Furthermore, even if the contract was beyond the scope of agreements contemplated by the Municipal Code, the contract would have been a manifestation of the parties' intent to exercise their constitutional—rather than statutory—powers. The Muni-

cipal Code would have limited the powers of the parties only if it had contained an express prohibition of some aspect of the 1971 Contract.

(Section 3.1 of the Intergovernmental Cooperation Act (Ill. Rev. Stat., 1980 Supp., ch. 127, par. 743.1), which provides for the establishment of a Municipal Joint Action Water Agency, has no bearing on the issues in this case. Section 3.1 became effective September 19, 1980, and contains no expressed or implied provisions requiring retroactive application.)

## II

Sherman argues that a municipality has police power to provide water to its citizens, that Sherman delegated that police power to Williamsville in the 1971 Contract, and that such a delegation of police power is impermissible. The preposterous import of this argument is that a town which is unable or unwilling to acquire its own water system could never enter into a binding contract with another municipality for exclusive water service. We have already concluded that article VII of the Illinois Constitution empowered both parties to make the 1971 Contract. Moreover, this type of contract is specifically authorized by statute:

> "The corporate authorities of each municipality may contract with any person, corporation, municipal corporation, political subdivision, public water district or any other agency for a supply of water." Ill. Rev. Stat. 1979, ch. 24, par. 11—124—1.

In its brief, Sherman quotes an American Law Report reference to *City of Quincy v. Bull* (1883), 106 Ill. 337, with the apparent belief that this case supports its position. We can only presume that Sherman's counsel never read this case. A reading of the opinion would have revealed that *City of Quincy* is diametrically opposed to the stand Sherman takes in this case.

In 1873, Quincy was lacking an adequate water system and was unable to finance one. It contracted with Edward Prince for a privately constructed and operated system. Under Quincy ordinances, Prince was granted the exclusive right to construct and operate a waterworks system in Quincy for 30 years. Prince was also granted a right-of-way over all city streets for laying water mains. Eight years later, Quincy repealed this ordinance and refused to permit the complainants to expand the system by laying new water lines. The complainants sought to enjoin the city from interfering with the laying of water pipes in city streets. The trial court issued an injunction and this order was affirmed by both the appellate court and supreme court.

The city argued that the ordinance granting the right-of-way for the purpose of laying pipes was entirely void for want of power in the city council to make such a binding contract. Quincy maintained that the city's

legislative power of control over the use of its streets was incapable of being abridged and must be left free to be exercised unrestrictedly from time to time as the city council saw fit. The supreme court responded to this argument by stating that "[w]e do not perceive how the doctrine as to the legislative powers of a municipality can be brought in and have any bearing upon the facts of this case." (106 Ill. 337, 351.) The court found that the city's power to grant the right-of-way was "quite clear" and that the case involved no more than "the simple law of contract[s]." The court concluded that "[t]he city must be bound by the contract and grant it has made, and had authority to make, the same as would an individual." (106 Ill. 337, 352.) This case stands for the proposition that a municipality cannot rescind an exclusive water distribution contract as an impermissible abrogation of its legislative power.

Time has not diminished the force of *City of Quincy*. We note that in a recent decision our supreme court did not hesitate to follow 19th century precedent. In *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, the court quoted from *Truitt v. People* (1878), 88 Ill. 518, and stated, "What was said in 1878 is valid today." (87 Ill. 2d 107, 124, 429 N.E.2d 508, 515.) Likewise, we find that what was said in 1883 is equally valid now.

### III

Sherman also contends that Williamsville breached the 1971 Contract in three respects:

(a) by declaring a moratorium on water main extensions;

(b) by an alleged failure to guarantee a water supply to Lincoln Land Downs; and

(c) by failing to supply water to The Rail and Villa Vianny projects.

A complaint for breach of contract must allege and the plaintiff must establish the existence of a contract, breach of the contract by the defendant, and damages to the plaintiff as a consequence. (*Thilman & Co. v. Esposito* (1980), 87 Ill. App. 3d 289, 408 N.E.2d 1014.) Sherman has not established a breach of contract by Williamsville. Sherman's complaint cites to no language, expressed or implied, in the 1971 Contract that was breached by Williamsville in declaring a moratorium or in its dealings with the three developments.

### IV

Sherman argues that the form contract used by Williamsville in connection with water main extensions installed by developers is inconsistent with the 1971 Contract. In the written order dismissing most of Sherman's complaint, the trial court *specifically* found that the water main extension contract is subject to Sherman's rights under the 1971 Contract.

## V

Sherman has raised several other frivolous issues in its brief which do not merit discussion.

The order of the trial court is affirmed.

Affirmed.

GREEN, P. J., and WEBBER, J., concur.