HENRY L. GREENHOLDT, Plaintiff-Appellant, *v.* ILLINOIS BELL
TELEPHONE COMPANY, Defendant-Appellee.

Fourth District   No. 17517

Opinion filed July 19, 1982.—Rehearing denied August 13, 1982.

Leahy and Leahy, of Springfield (Mary Lee Leahy and Andrew J. Leahy, of counsel), for appellant.

Alfred B. LaBarre, of Ensel, Jones, Blanchard & LaBarre, of Springfield, for appellee.

JUSTICE MILLS delivered the opinion of the court: .
Did Illinois Bell violate article I, section 17, of the State Constitution?
No—Illinois Bell's "intercity transfer policy" does not fall within the pale of section 17.

## BACKGROUND

Henry Greenholdt had been an employee of Illinois Bell for 23 years. He started as a frame man installing wires at the central office in Chicago, worked his way up in the company over the years, and in 1962 was promoted to a systems staff analyst in the comptroller's office. In 1965, Greenholdt was appointed assistant data processing manager in Bell's Marquette Park office and two months later was promoted to manager. In 1969, he was transferred to the Arlington Heights office where he was responsible for converting the computer punch card system to a magnetic tape and disk program. This conversion became known as the CRIS (Customer's Records Information System) conversion.

In September 1970, Greenholdt was transferred to the comptroller's office in Springfield to head up the same type of CRIS conversion that he had managed in Arlington Heights. Several other Chicago employees were sent to Springfield to work on the conversion. Also, two persons were hired out of college to work on the project and there were some regular Springfield employees who were assigned to the conversion project. The project began in 1970 and was completed in 1971. After the conversion, there was an excess of management level employees in the Springfield office. Except for Greenholdt, everyone who had either been transferred to Springfield or specifically hired to work on the CRIS conversion was transferred to Chicago by the end of 1972. He stayed in Springfield, was promoted to district manager, and replaced the former district manager who was transferred to Chicago.

At a meeting in July 1978 between Greenholdt, Chuck Scott (his supervisor), and Joe Abel (Scott's supervisor), Greenholdt was asked what his position was concerning a transfer to Chicago. He said he did not want to leave Springfield because his two daughters were just entering high school, his wife was involved in "enterprises" that could not be duplicated elsewhere, both he and his wife were involved in the community, and one of his daughters had a medical problem that could best

be handled in Springfield. Abel told Greenholdt that he did not know if any transfers were "in the mill" but that his name would come up when transfers were discussed and he wanted to know how Greenholdt felt before anything happened.

Towards the end of July, William Springer, the comptroller, met with the assistant comptrollers to discuss different job openings and the needs of the business. There was a staff opening in Chicago, which Joe Abel described as one of the more critical staff assignments, and it was decided that Greenholdt was the best candidate for the position. Abel testified:

"We did talk about the fact that Hank would not want to move from Springfield, but when we looked at the opportunity for him and the needs of the business, it seemed to be a good fit. We also had a man by the name of Bill Pietrowics at AT&T, and Bill had had a single District level assignment on AT&T staff and had not had any line experience, and it seemed also to be a good time to give him a directly centralized line operation, and the plan unfolded of Hank coming to Chicago to take the staff assignment and Bill Pietrowics to follow in behind Hank."

On August 7, 1978, Greenholdt's supervisor told him he was being transferred to Chicago and that Bill Pietrowics was replacing him in Springfield. Later that day, Greenholdt talked with Joe Abel who sympathized with his desire to stay in Springfield but told him that the transfer would enable him to progress in the company and that the transfer was good for Bill Pietrowics and good for the company. Later in August, Greenholdt arranged a meeting with Chuck Scott and Joe Abel. He told them he could not move to Chicago and reiterated the reasons he had expressed to them in their July meeting. Greenholdt subsequently wrote to William Springer, the comptroller, and Charles Marshall, the president of Illinois Bell, asking them to countermand the transfer. Both refused.

Abel had several conversations with Greenholdt, attempting to change his mind about moving to Chicago. When Bill Pietrowics moved into the Springfield office in September, Abel flew to Springfield and met with Greenholdt and Chuck Scott to discuss one more time Greenholdt's decision to refuse the transfer. Abel testified that Greenholdt's position in Chicago was left open for several weeks "in the hope that maybe something could come around here." Greenholdt never showed up in the Chicago office and the position was subsequently filled. None of Greenholdt's supervisors told him he was fired. His employment record indicates that he "resigned—abandoned job."

Count I of Greenholdt's three-count complaint alleged that he was deprived of his right to be free from discrimination based on sex in violation of article I, sections 17 and 18, of the 1970 Illinois Constitution. Count II alleged that Illinois Bell's act of sex discrimination was done knowingly, wilfully and deliberately, and count III alleged that Bell

breached an implied contract by transferring Greenholdt. Pursuant to Bell's motion to dismiss, the trial judge dismissed counts I and II to the extent that they were based on article I, section 18. Count III was stricken but Greenholdt was allowed 10 days to file an amendment. At the close of Greenholdt's evidence, Bell again made a motion to dismiss the complaint. The motion was denied as to counts I and II and allowed as to count III. After hearing all the evidence, the trial judge entered a judgment in favor of Illinois Bell and Greenholdt appeals from that judgment.

Greenholdt argues that the trial court's judgment was against the manifest weight of the evidence. At trial, he attempted to establish that Bell's transfer policy discriminated against males, in that male managers were required to accept transfers or lose their jobs, whereas female managers were given the option to refuse transfers. Greenholdt's evidence consisted chiefly of the testimony of managerial employees who worked in the Springfield office from 1970 to 1978. This evidence was offered to show that more men than women were transferred from Springfield and that women were given the option to refuse transfers. Bell offered evidence showing that its transfer decisions were based on several factors but not on the employee's sex. The most compelling of Bell's evidence was that an employee's management level was a key factor in whether he or she was expected to transfer. The higher one was in the managerial hierarchy, the greater the expectation that that person would be transferred. Greenholdt, a level 3 manager, was the highest ranking employee in the Springfield office. All of the women in the Springfield office were level 1 managers except for one who was a level 2 manager.

We do not, however, reach the question of whether the trial court's judgment was against the manifest weight of the evidence, for we hold that the trial court erred in denying Bell's motion to dismiss Greenholdt's complaint for failure to state a cause of action.

CONSTITUTIONAL INTENT

I

Article I, section 17, of the Illinois Constitution provides:

"All persons shall have the right to be free from discrimination on the basis of race, color, creed, national ancestry and sex in the hiring and promotion practices of any employer or in the sale or rental of property." (Ill. Const. 1970, art. I, sec. 17.)

Greenholdt first contends that section 17 is not limited to hiring and promotion practices, but rather, extends to all employment practices.

■■ A court must construe a constitutional provision so as to effectuate the intent of its drafters. (*People v. Turner* (1964), 31 Ill. 2d 197, 201 N.E.2d 415.) The best indication of the intent of the drafters of a constitutional provision is the language which they voted to adopt. (*Coryn v. City of*

*Moline* (1978), 71 Ill. 2d 194, 374 N.E.2d 211.) And the courts will interpret that language in accordance with its plain and commonly understood meaning. (*Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 359 N.E.2d 138; *Hamer v. Board of Education* (1970), 47 Ill. 2d 480, 265 N.E.2d 616.) The plain and commonly understood meaning of "hiring and promotion practices" does not include all employment practices.

■■ An additional aid in the construction of constitutional provisions is the record of the proceedings of the constitutional convention which our courts have consulted in order to give effect to the policies involved. See *Board of Education v. Bakalis* (1973), 54 Ill. 2d 448, 299 N.E.2d 737; *Village of Sherman v. Village of Williamsville* (1982), 106 Ill. App. 3d 174, 435 N.E.2d 548.

When section 17 was presented to the delegates by Lewis Wilson, several questions were raised as to why the section was limited to hiring and promotion practices. (See 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1595-96 (hereinafter cited as Proceedings).) Delegate Wilson's responses to these qustions are a bit problematic. There is language in the record revealing that Delegate Wilson was of the belief that the Bill of Rights committee, which drafted section 17, intended the section to cover all employment practices. Delegate Wilson did recognize, however, that the wording of section 17 may not have been so inclusive, but stated that this was a question "basically of language rather than thought." (3 Proceedings 1595.) The problem is, of course, that a question of language *is* a question of thought. The fact that the delegates were well aware of the limited wording of the proposed section and yet adopted that language, without amendment, indicates that they intended section 17 to only extend to hiring and promotion practices as opposed to all employment practices. Furthermore, the comments of James Kemp, the vice chairman of the Bill of Rights committee, indicate that the particular words used by the drafters were thoughtfully chosen:

"The absence of a constitutional provision providing for equality of employment opportunity and upgrading based on merit, coupled with the absence of a constitutionally provided access to housing depending upon one's ability to pay, produces the following drag on the Illinois economy—." (3 Proceedings 1595.)

The ideas of "employment opportunity and upgrading based on merit" are accurately reflected in the words "hiring and promotion practices."

■■ The plain meaning of the language used in section 17, along with the insight provided by the vice chairman of the committee which drafted that section, lead us to the conclusion that article I, section 17, extends to hiring and promotion practices but not to all employment practices.

## II

■■ We must next determine whether Bell's intercity transfer policy was a "promotion practice" within the meaning of section 17. For the purpose of ruling on the trial court's denial of Bell's motion to dismiss Greenholdt's complaint for failure to state a cause of action, the allegations of plaintiff's complaint stand admitted. (*People ex rel. Byrnes v. Stanard* (1956), 9 Ill. 2d 372, 137 N.E.2d 829.) Accordingly, we presume, as Greenholdt alleged, that Bell required its male managers to transfer, while it allowed its female managers the option to refuse transfers.

■■ It is uncontested that Greenholdt's transfer to Chicago was not a promotion. However, both parties recognized that the experience Greenholdt would have gained from the new position would have been a favorable consideration in connection with a possible future promotion. Admittedly, some nexus exists between the alleged transfer policy and promotions. Yet a "nexus" analysis is of little use since with the proper semantic gymnastics any practice could be characterized as a hiring and promotion practice. A more functional approach to this problem is to inquire whether characterizing Bell's policy as a promotion practice would further the purpose of section 17. We consider the rule of statutory construction which requires a reviewing court to interpret a statute in such a manner as to promote its essential purpose to be equally applicable to the interpretation of constitutional provisions. See *Stubblefield v. City of Chicago* (1971), 48 Ill. 2d 267, 269 N.E.2d 504; *Craig v. Peterson* (1968), 39 Ill. 2d 191, 233 N.E.2d 345; see also *Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 359 N.E.2d 138; *Johnson v. State Electoral Board* (1972), 53 Ill. 2d 256, 290 N.E.2d 886.

To discern the purpose of section 17 we must, once again, delve into the record of proceedings of the constitutional convention. Delegate Wilson, who initially presented section 17 to the convention, indicated the reason for section 17 was that the right to be free from discrimination was fundamental and that it was "on the same plane with the other basic rights guaranteed by the constitution—freedom of speech, freedom to assemble, freedom to worship, due process of law." (3 Proceedings 1593.) However, this does not explain why the Bill of Rights committee intentionally limited section 17 to the specific areas of hiring and promotion practices in employment and the sale and rental of property. An explanation for this limited scope was provided by the committee's vice chairman. Delegate Kemp's comments, which we have quoted in part above, bear repetition:

"The absence of a constitutional provision providing for equality of employment opportunity and upgrading based on merit, coupled with the absence of a constitutionally provided access to

housing depending upon one's ability to pay, produces the following drag on the Illinois economy—.

\* \* \*

—now second-generation public assistance families which cost you, the taxpayer, money; and increased Illinois prison population which costs you, the taxpayer, money; the expressway construction and maintenance cost which costs you, the taxpayer, money." 3 Proceedings 1595.

A concept similar to that described by Delegate Kemp had earlier prompted the Illinois legislature to enact the former Fair Employment Practices Act (Ill. Rev. Stat. 1979, ch. 48, par. 851 *et seq.*), repealed and superseded by the Human Rights Act (Ill. Rev. Stat. 1981, ch. 68, par. 1—101 *et seq.*). Section 1 of the Act was a declaration of policy in which the General Assembly stated:

"Whereas denial of equal employment opportunity because of race, color, religion, sex, national origin, ancestry, physical or mental handicap unrelated to ability, or unfavorable discharge from military service, with consequent failure to utilize the productive capacities of individuals to the fullest extent deprives a portion of the population of the State of earnings necessary to maintain a reasonable standard of living, thereby tending to cause resort to public charity and may cause conflicts and controversies resulting in grave injury to the public safety, health and welfare:

Therefore, it is declared to be the public policy of this State that \* \* \* equal employment opportunity or apprenticeship opportunity without discrimination \* \* \* should be protected by State law." Ill. Rev. Stat. 1979, ch. 48, par. 851.

Whether the purpose of section 17 is regarded as establishing fundamental rights or promoting sound economics or both, the means by which these purposes are to be effected was accurately described by Delegate Kemp. With respect to the areas of employment, these purposes are achieved by providing for "equality of employment opportunity and upgrading based on merit."

■■ Because we are dealing with an alleged promotion practice, our inquiry is whether Greenholdt was denied the opportunity for upgrading based on merit. When presented with the question of whether Greenholdt was denied an equal opportunity for advancement based on merit, our response must be that he was not denied such an opportunity. The record shows that the transfer would have improved his position with respect to future promotions. This potential for advancement was not denied him. On the contrary, the opportunity was offered to him and he refused it. The discriminatory practice, as alleged by Greenholdt, does not deprive males of an equal opportunity for advancement based on

merit. Therefore, it would not further the purposes of section 17 to characterize the alleged practice as a promotion practice within the meaning of section 17.

The trial court erred in denying Bell's motion to dismiss Greenholdt's complaint for failure to state a cause of action. The judgment of the trial court is vacated, and the case is remanded with directions that the complaint be dismissed.

Judgment vacated and case remanded with directions.

GREEN, P. J., and TRAPP, J., concur.