OAKLEAF OF ILLINOIS, Plaintiff-Appellee, v. OAKLEAF & ASSOCIATES, INC., Defendant-Appellant.

First District (2nd Division)   No. 87—1540

Opinion filed August 2, 1988.

638

Carponelli, Krug & Lerum, of Chicago (Norman J. Lerum and Stephen P. Carponelli, of counsel), for appellant.

Dan Brusslan and Stephen R. Miller, both of Fischel & Kahn, Ltd., and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant Oakleaf & Associates, Inc. (Oakleaf), appeals from a jury verdict of $1 million for plaintiff Oakleaf of Illinois, Division of Mini Comp (Mini Comp).[1] The award is comprised of lost profits resulting from the breach of a sales distribution agreement between the parties.

The issues arising from the trial include whether: (1) Oakleaf's breach of contract caused Mini Comp's damages; (2) Mini Comp's calculation of lost profits was improper; (3) a Mini Comp witness was erroneously permitted to testify as an expert; and (4) hearsay testimony and closing argument by Mini Comp's counsel denied Oakleaf a fair trial.

Mini Comp was formed in Iowa by insurance salesman Dennis Burns and computer programmer David Cox. Mini Comp distributed a

---

[1]Although identified in the contract documents as "Oakleaf of Illinois," to avoid confusion because of the name similarity, plaintiff will be referred to simply as Mini Comp throughout this opinion. The circuit court also found the true plaintiff to have been Mini Comp.

finance and insurance minicomputer, manufactured by Oakleaf, to automobile dealers. Oakleaf was founded in 1974 by Anders Eklov, who developed a computer (SX-330) with a built-in printer in 1977 to calculate and print certain forms used by automobile salesmen.

In autumn 1977, Burns first met Eklov; both were selling products to automobile dealer financial and insurance departments in California. Burns saw a demonstration of Eklov's computer there and discussed with him plans to market the product in Chicago.

Burns and Eklov travelled to Chicago together in February 1978, met Cox there, and visited automobile dealers, finding considerable enthusiasm for the computer they demonstrated. They discussed an exclusive distributorship of the computer for Burns and Cox. Eklov drew up the agreement, signed a lease for an office in Elmhurst, Illinois, to be shared by the parties, and asked Burns and Cox to start with $100,000 in capital; work full time in Chicago (Burns lived in California, Cox in Iowa); and make no sales of credit insurance connected with sales of his computers.

The parties signed the three-year distribution agreement in May 1978, which provided that, effective June 1, 1978, "Manufacturer [Oak Leaf] appoints Distributor [Mini Comp] as its exclusive selling representative to sell products *** in the state of Illinois only ***." The products were described as integrated finance and insurance minicomputers, designated as Oakleaf SX-330, to be made available to Mini Comp for $6,400 each, with a suggested selling price of $9,400. Oakleaf would supply all programming and technical services and retain revenue for such services. In exchange for using the Oakleaf name, among other things, Mini Comp agreed not to market any other products, system or services. Oakleaf could not terminate the agreement if sales quotas were achieved and if Mini Comp did not default on any provisions. The parties set the initial sales quota for the year ending May 31, 1979, at 120 minicomputers.

The record evidence supports the following summary. Mini Comp began marketing even before signing the agreement, obtaining a bank loan for $35,000 and purchasing an SX-330 around May 15, 1978. Burns and Cox rented an apartment in Illinois; Burns flew in from California to work four days per week while Cox drove in from Iowa. At first, lacking the Illinois software, they encountered sales resistance, since each State had its own insurance laws and tax rates and automobile dealers wanted a product they could use immediately. Eklov kept assuring them that the software was almost ready, but not until late July or early August did they receive a fairly complete software package. Eklov, however, believed Burns and Cox could

demonstrate the machine, using California software, to obtain sales orders.

Mini Comp sold its machines for $9,800 for the computer alone or for $11,000 with software including a "TRW" option, which permitted communication with credit agencies. Eklov had not originally intended to include the TRW option as part of his agreement, but it was furnished later; he had sold machines in California for $9,400 including the TRW.

In September 1978, Mini Comp installed six machines and hired a salesman, Roger Moore, and in October nine more computers were sold. Burns testified that problems developed in October when some computers arrived without memory chips, which Oakleaf's local manager, Andre Hansen, had to locate. Other machines also arrived with parts missing, which required cannibalization of computers, since the supply of spare parts in Illinois was inadequate. Hansen testified that machines lacking memory chips were a problem near the end of 1978. For three to four weeks chips were not available and computers were not shipped from California until he located a supply in Chicago. Mini Comp did not pay for its computers until all the parts arrived.

In autumn 1978, Oakleaf began negotiations with Reynolds & Reynolds Company (Reynolds), which sold general purpose main frame computers to automobile dealers. Mini Comp worked with Reynolds cooperatively setting up demonstrations. According to Eklov, he kept Burns and Cox informed and they thought Reynolds' prestige would be helpful; however, they testified that they were very upset despite Eklov's repeated assurances that their business would not be adversely affected. Mini Comp installed 13 machines in January 1979, the most to that point, but in February spare parts problems adversely affected sales. At the National Auto Dealers Convention in late February, Oakleaf management became upset when Mini Comp was demonstrating the SX-330 and Burns overheard Eklov talking with a Reynolds employee concerning using that machine for interfacing with a Reynolds computer.

At a California meeting on February 27, 1979, Burns, Cox and Eklov agreed, in a contract addendum, that Wisconsin and Iowa would be added to Mini Comp's territory, with monthly sales quotas of five and three, respectively, starting March 1, 1979, for the former and April 1, 1979, for the latter. Cox and Burns claimed to have received assurances that any arrangement Oakleaf made with Reynolds would not injure them, but would enhance everyone's prospects. Burns remembered Eklov insisting that Reynolds would handle a dif-

ferent machine on a limited basis, not in Mini Comp's area, and would have nothing to do with Mini Comp. Eklov testified that the two States were added to Mini Comp's territory as compensation for the Reynolds deal.

Mini Comp hired three additional salesmen, two for their new territories. Mini Comp also made some sales in Indiana in the belief that Eklov had approved its selling in northwestern Indiana near Chicago; Eklov disagreed, but Oakleaf installed the machines in Indiana anyway.

On March 2, 1979, Eklov signed an agreement for Reynolds' purchase of 1,000 SX-330 units over 18 months, including software to support integration of the SX-330 with VIM machines sold by Reynolds. Installation was scheduled to begin in June 1979. Reynolds would sell the SX-330 as part of an integrated system to customers who used or ordered Reynolds VIM II or III or any subsequent VIM computer systems. The price per unit to Reynolds would depend on the number of machines ordered in any month, starting with $6,500 for one machine and decreasing to $4,700 per machine if 110 or more computers were ordered. The agreement related that Reynolds had already ordered and received 25 SX-330 units for program development and demonstrations and Oakleaf acknowledged receipt of $40,625 as 25% payment on that initial order. Reynolds could sell the SX-330 in any State it sold its VIM systems; a schedule provided for making software available for all 48 States in the continental United States and the District of Columbia. Software for Illinois would be available by June 1, 1979, for Wisconsin by November 1, 1979, and for Iowa by January 1, 1980.

Reynolds also encountered delays in obtaining Oakleaf equipment, software and servicing when it started operations. During 1979 and early 1980, Reynolds sold SX-330 units that were installed prior to being fully integrated with its VIM computers.

By April 1979, Andre Hansen and his wife Sally, who had run Oakleaf's support office in Illinois, were transferred to Texas; Cox and Burns found their replacement, Jeanne Giambrone, inadequate. She admitted to having little knowledge of computers, feeling overwhelmed, blowing up some machines accidentally and lacking computer spare parts. Erica Schmidt, however, who worked in Oakleaf's Illinois office at the same time, remembered providing quick repair service and did not hear of any machines being blown up. Mini Comp complained of delays in receiving computers, problems with missing parts and a cooling of their former relationship with Reynolds at the same time Oakleaf wanted prompter payment for machines already

shipped. According to Burns, as late as April and May 1979, Eklov denied having reached an agreement with Reynolds.

A new Oakleaf plant was opened in Puerto Rico in April and May 1979. An improved SX-330 with a different printer, more reliable circuit boards and increased memory was manufactured there. Although Oakleaf referred to this unit as an SX-330-II, the label on the machine remained the same and they were furnished to Mini Comp as well as to Reynolds. Eklov believed machines continued to be available, but Burns asserted that Oakleaf made no deliveries in June.

On June 26, 1979, Cox wrote Eklov offering to assign Oakleaf a letter of credit equal to the cost of four machines and to obtain the capability to transfer payments directly to Oakleaf's account in return for assurances that Oakleaf would be able to ship and install four machines each week. Cox complained about the delay in completing the Illinois software; a two-week period in December without Oakleaf's technical support; the transfer of the Hansens to Texas; the unavailability of computers and certain parts; and completion of neither the Iowa, Indiana nor the Illinois software. Eklov considered the proposed arrangement workable but never responded in writing to the letter or received a letter of credit.

The relationship of the parties continued to deteriorate during the second half of 1979. Cox and Burns complained to Eklov that Reynolds was aggressively pursuing sales in their territory. They were dissatisfied with Eklov's assertion that Reynolds was selling a different machine. Eklov began receiving reports that Burns and Cox were not present at their place of business and were involved in selling credit life insurance. Burns and Cox admittedly investigated going into credit life insurance under the name "Autoway" but made no sales. They also had another business, "Magic Automotive Products." Oakleaf and Mini Comp stopped sharing the same office in Illinois in September at Oakleaf's request and Cox and Burns consulted their attorney.

By November 1979, Eklov informed Mini Comp it could no longer sell to VIM customers. Cox and Burns heard from Oakleaf's regional managers that Eklov was unhappy they had a distributorship. In the last three months of 1979, they only sold 11 machines, including one sale in December. In January 1980, their top salesman, Roger Moore, left them for Oakleaf and informed them that Eklov was ending their distributorship. Another salesman also resigned.

Meanwhile, on December 17, 1979, Eklov wrote Cox, pointing out that Mini Comp owed Oakleaf $32,000, requesting payment im-

mediately and reminding him that their agreement restricted marketing of other products or services, such as credit insurance. On January 16, 1980, Cox replied complaining of "intentional and conspiratorial violations" of the agreement, Reynolds' invasion of their territory in violation of Mini Comp's rights, Moore's resignation to work directly for Oakleaf and his diverting sales from Mini Comp. Cox offered immediate payment for the five computers referred to in Eklov's December 17, 1979, letter in return for written assurances that Oakleaf would stop the mentioned activities of Reynolds and Moore and correct remaining problems with delivery, software and technical assistance. Cox requested a meeting as soon as possible and noted that Mini Comp's rights could be legally enforced.

Oakleaf's attorney wrote Mini Comp's counsel on January 28, 1980, asserting that early in 1979 Cox and Burns agreed they could not meet quota; thus, their exclusivity had been terminated and only on that basis was the agreement extended to Wisconsin and Iowa. Oakleaf's attorney claimed that Mini Comp was trying to tie in sales of computers with credit life insurance and other automotive products, pirating messages to Moore and Oakleaf, and conspiring to sell the computer at a reduced price to damage Oakleaf's name and notified Mini Comp that the distribution agreement was terminated. After demanding prompt payment of $36,700 owed by Mini Comp, Oakleaf's attorney stated he was authorized to negotiate a nonexclusive distribution agreement provided payment be made in full, Mini Comp not sell the computer in conjunction with other products and not use the Oakleaf name or logo.

Mini Comp filed a verified complaint in five counts on February 25, 1980, against defendants Oakleaf, Reynolds and Moore for breach of contract and interference with contract, requesting both injunctive relief and damages. Four amended complaints were subsequently filed and defendants other than Oakleaf were dismissed. In its fourth amended complaint, Mini Comp in two counts (both as individuals and as a corporation) charged Oakleaf breached its contract by shipping computers with missing parts; making untimely shipments of computers and spare parts; failing to provide software in a timely manner; failing to provide adequate spare parts, computers, programming and technical support; assigning sales rights in its exclusive territory to another company; and using its own sales force in that territory.

Oakleaf responded by denying it violated the contract and asserted that Mini Comp had first breached the contract by failing to sell its quota and to pay for computers it received; failing to make

timely payments; and selling machines outside its territory. Both parties filed motions to bar or limit proposed testimony of each other's expert witnesses.

At trial, Mini Comp requested $1,128,839 in damages for lost profits through testimony of Cox. He calculated that amount on the basis of the average gross price of the 115 computers plaintiff sold ($10,883), multiplied by 573 (the quota number for all three States for the entire duration of the agreement and an amount he considered reasonable based on his experience), less the fixed costs for the 115 machines sold and the variable costs, calculated on a basis of 77½% of gross sales, a percentage derived from the actual costs for computers sold, less the actual profits made by Mini Comp from June 1, 1978, through December 31, 1979, of $77,012.

Oakleaf's expert witness, a certified public accountant who had taught cost profit analysis, doubted Cox' figures, believing such projections not accurate outside a relevant range of usually not more than a 30% increase; however, the expert did not know the correct relevant range for such an estimate and had no opinion on what the correct amount of lost profits would be. He thought a market research study or opinion polls might be helpful in determining the correct amount.

In closing argument, Oakleaf suggested a proper calculation of lost profits would start by using the suggested manufacturer's selling price of $9,400, instead of $10,800, applying a 10% volume discount to reach $8,460, then multiplying that by 573, which would result in a loss to Mini Comp of $200,000, using the same total variable and fixed costs as in Mini Comp's calculations. The circuit court included unjustifiable termination of the contract by Oakleaf in the issues instruction. Oakleaf's motions for a directed verdict were denied. The jury awarded Mini Comp damages as previously stated.

On March 16, 1987, Oakleaf filed a post-trial motion requesting alternative relief in the form of judgment *n.o.v.*, a new trial or a remittitur reducing damages to $1, asserting that the jury verdict on damages was illogical since "[t]he evidence supports a verdict of $1,200,000 or nothing."

At a hearing held on May 11, 1987, Oakleaf insisted that any damages verdict below $1.128 million was a compromise verdict, but stated it could understand a verdict for $77,000 to match Mini Comp's profits actually earned in the first half of the contract period. Oakleaf attacked the figure of 573 probable computer sales and noted Mini Comp never made its quota. Stating that the profit margin figure Mini Comp used was correct, Oakleaf asked for a new trial

on damages, maintaining it could not at the same time convince a jury the contract was not breached but if it was breached only reasonable damages should be awarded. The circuit court criticized defendant's all or nothing trial strategy, noted its damages expert failed to express an opinion as to damages and denied the post-trial motion. Defendant appeals.

## I

■ In a threshold appellate procedural motion, Mini Comp requests that Oakleaf's brief be stricken for failure to present a fair and nonargumentative statement of facts, thereby allegedly violating Supreme Court Rule 341(e)(6) (113 Ill. 2d R. 341(e)(6)). Mini Comp relies on *Midland Hotel Corp. v. Reuben H. Donnelley Corp.* (1986), 149 Ill. App. 3d 53, 57-58, 501 N.E.2d 1280, *aff'd in part* and *rev'd in part* (1987), 118 Ill. 2d 306 *(Midland I)*, in which this court criticized an argumentative brief for generating confusion, but did not strike the brief.

Oakleaf's statement of facts, although argumentative at times, includes appropriate record references. It lacks rules violations so flagrant as to hinder or preclude review. *(James v. Yasunaga* (1987), 157 Ill. App. 3d 450, 452, 510 N.E.2d 531, *appeal denied* (1987), 116 Ill. 2d 559; *Gallo v. Henke* (1982), 107 Ill. App. 3d 21, 25, 436 N.E.2d 1068.) Accordingly, the motion to strike Oakleaf's brief is denied.

## II

Oakleaf first maintains that the circuit court should have granted a directed verdict or judgment *n.o.v.* because Mini Comp failed to prove that any breach of contract caused it to suffer damages. Oakleaf claims that Mini Comp actually profited during 18 months of selling the SX-330; no order of equipment went unfulfilled; and no witness from an automobile dealership testified that Oakleaf's actions caused Mini Comp to lose one sale. Oakleaf concludes that Mini Comp failed to meet its burden of proof on causation; instead, Mini Comp merely speculated that Oakleaf's conduct cooled its market.

■ ■ The standard for both a directed verdict and judgment *n.o.v.* is whether all the evidence viewed most favorably to respondent so overwhelmingly favors movant that no contrary verdict based on such evidence could ever stand. *(Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) In a contract action, plaintiff must establish damages resulting from defendant's breach of contract to recover *(Village of Sherman v. Village of Wil-*

*liamsville* (1982), 106 Ill. App. 3d 174, 181, 435 N.E.2d 548), and must demonstrate that defendant's breach caused it to lose profits (*Midland Hotel Corp. v. Reuben H. Donnelley Corp.* (1987), 118 Ill. 2d 306, 316, 515 N.E.2d 61 (*Midland* II); *Schwartz v. City of Chicago* (1974), 21 Ill. App. 3d 84, 95, 315 N.E.2d 215).

In the case *sub judice*, Mini Comp produced evidence that its sales activities were hampered by Oakleaf's failure to promptly provide machines, spare parts and technical help, as well as by Oakleaf's aiding Reynolds' intrusion into its exclusive territory. The Illinois software was not ready on June 1, 1978, when the contract period began and the market appeared excellent for sales of the new computers. Burns and Hansen both testified that Illinois automobile dealers were not interested in installing machines with California software. That delay cost Mini Comp two months in potential sales, as the dealers were unwilling to place orders without Illinois software being immediately available. Similarly, the Iowa software also was delayed. Shortages of spare parts and machines and the poor quality of technical help available after the Hansens left Illinois is claimed to have impeded Mini Comp's success. Hansen testified to periods of delayed shipments and the jury reasonably could have inferred that such delays made installation and sales more difficult. Giambrone admitted she was not well qualified for her job and had numerous problems obtaining spare parts; the jury could logically conclude that those problems caused Mini Comp sales difficulties and resultant damages.

The jury also heard evidence that Reynolds' competition injured Mini Comp. Burns complained to Eklov of Reynolds' aggressiveness and price cutting. Reynolds sold computers in Illinois, Iowa and Wisconsin. Eklov testified Oakleaf delivered seven computers in 1979 and 20 in 1980 to Reynolds for installation in Illinois. In the period January 1980 through May 1981, Oakleaf itself sold 34 machines in Mini Comp's three-State territory. Although no specific testimony of a lost sale directly caused by Oakleaf's actions was presented, the jury could have concluded that Oakleaf's enumerated actions caused Mini Comp to lose sales and profits. Viewed in a light most favorable to Mini Comp, the evidence fails to overwhelmingly favor Oakleaf. The circuit court did not err by denying Oakleaf's directed verdict or judgment *n.o.v.* motions.

Oakleaf directs our attention to Mini Comp's failure to meet quotas and make prompt payments, on the basis that a party who has breached a contract cannot recover under it. (*Tel-Radio Transport Corp. v. Cantrell & Cochrane Corp.* (1963), 43 Ill. App. 2d 84,

91, 192 N.E.2d 584.) A party whose actions preclude performance by the other party may not, however, complain of the second party's nonperformance. (*Barrows v. Maco, Inc.* (1981), 94 Ill. App. 3d 959, 966, 419 N.E.2d 634; *Gamm Construction Co. v. Townsend* (1975), 32 Ill. App. 3d 848, 851, 336 N.E.2d 592.) At bar, the jury had the right to believe evidence which indicated that Oakleaf committed initial breaches of contract, such as delays in providing software, and that such actions caused Mini Comp to fail to meet its quota.

## III

The evidence concerning lost profits of $1,128,839 introduced by Mini Comp is claimed by Oakleaf to have lacked a foundation and to have been patently unreliable. Oakleaf insists the projection depended upon unsound assumptions that Mini Comp could have sold 573 minicomputers; the first-year quota could have been met in succeeding years; the contract quota could have been met although its price was higher than the suggested retail price; and Mini Comp's fixed and proportional variable expenses would have remained the same whether 573 or 112 computers were sold.

■ The amount of lost profits need not be established with absolute certainty; mathematical precision is not possible in calculating prospective profits. (*Midland*, 118 Ill. 2d at 315-16.) Nevertheless, recovery of profits cannot merely depend upon conjecture or speculation. (*Midland*, 118 Ill. 2d at 316; *Weiland Tool & Manufacturing Co. v. Whitney* (1969), 44 Ill. 2d 105, 118, 251 N.E.2d 242.) Recovery can be obtained where criteria exist by which probable profits can be estimated with reasonable certainty or approximated by competent proof. Otherwise, exclusive sales contracts could be violated with impunity. (*Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 289, 115 N.E. 389.) In cases of this character, the law requires evidence, with a fair degree of probability, which tends to establish a basis for the alleged damages. *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 148, 281 N.E.2d 323, *Barnett v. Caldwell Furniture Co.*, 277 Ill. at 289.

■ Violations of exclusive sales contracts can be recompensed by a damage award based on the amount of sales made by a competitor in the identified territory (*Transcon, Inc. v. Motion, Inc.* (1973), 14 Ill. App. 3d 61, 65, 67, 302 N.E.2d 135), or the amount of plaintiff's prior sales (*Barnett v. Caldwell Furniture Co.*, 277 Ill. at 289; see *Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, 425 N.E.2d 1060; *De Koven Drug Co. v. First National Bank* (1975), 27 Ill. App. 3d 798, 800-03, 327 N.E.2d 378). Testimony of an inter-

ested witness can be used as the foundation basis for lost profit figures. *M & W Gear Co. v. AW Dynamometer, Inc.* (1981), 97 Ill. App. 3d 904, 911, 424 N.E.2d 356; see *Kaiser Agricultural Chemicals v. Rice* (1985), 138 Ill. App. 3d 706, 714-15, 486 N.E.2d 417.

■ In the instant case, Mini Comp's calculations of lost profits were based on the net profit margin of the 115 sales it had made prior to Oakleaf's termination of the contract. Cox projected that if not for Oakleaf's contract breaches, Mini Comp could have made its sales quota. He insisted further that the quota, although agreed to before any sales were made in the three States, also represented his best projection based on his experience in the business. Evidence of Reynolds' actual sales in the "exclusive" territory in the period ending June 1, 1981, would have been helpful in assessing this projection and Mini Comp sought to introduce such figures; however, Oakleaf successfully objected to Mini Comp's attempts to introduce such evidence because it would have come through testimony of a Reynolds employee who did not know the information himself but could have identified appropriate business records. Eklov supplied some evidence of Oakleaf's own sales in the territory and of Reynolds' sales in 1979 and 1980, but not of Reynolds' sales in the first five months of 1981. Only projections reasonably could have estimated lost sales due to Oakleaf's delays in furnishing software, machines and spare parts. Oakleaf's contract violations allegedly occurred throughout the sales period; therefore, the use of a quota projection is not unreasonable in the circumstances. The jury apparently considered the quota estimate somewhat high, as it awarded damages in a lesser amount.

■ In closing argument, Oakleaf estimated that all projected 573 sales would yield an average price of $8,640, ignoring the fact that 115 machines already had been sold at an average price of $10,883. Oakleaf failed to present evidence to contradict the amount of damages Mini Comp sustained, other than its expert's opinion expressing skepticism concerning Cox' calculations. (See *Ray v. Winter* (1977), 67 Ill. 2d 296, 307, 367 N.E.2d 678.) The jury had the right to weigh this evidence and find Mini Comp's the most credible. Interestingly, at trial and during the post-trial hearing, Oakleaf conceded the validity of some of Mini Comp's calculations. For example, at the post-trial hearing the following colloquy ensued:

"MR. CARPONELLI [Oakleaf's counsel]: [T]he big problem here is not what their profit margin was. That's undisputed.

* * *

THE COURT: You've agreed, then, that the profit margin is correct. Its the number—

MR. CARPONELLI: I agree. The profit margin we took pot shots at it. But, I mean, how can I argue with it?" During closing argument, Oakleaf used only one projection of its own—based on Mini Comp's sale of 573 machines, a figure it later asserted to be completely unreliable, both at the post-trial hearing and on appeal. The right to complain of an error is waived when doing so is inconsistent with that party's position in a prior court proceeding. (*Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 543, 475 N.E.2d 817.) The theory upon which a case is tried cannot be changed on review. *In re Estate of Leichtenberg* (1956), 7 Ill. 2d 545, 548, 131 N.E.2d 487; *Hayes v. Preferred Risk Mutual Insurance Co.* (1978), 66 Ill. App. 3d 112, 115, 383 N.E.2d 669.

Cases Oakleaf relies upon are factually distinguishable. Plaintiff failed to isolate the amount of lost profits resulting from defendant's action, as opposed to other causes, in *Midland* (118 Ill. 2d at 317-18). False predictions were used in *Magna Weld Sales Co. v. Magna Alloys & Research Pty. Ltd.* (9th Cir. 1976), 545 F.2d 668, 672. Plaintiff claimed it would have no increased overhead expenses when distributing additional lines of merchandise in *S. A. Maxwell Co. v. De-Soto, Inc.* (1979), 73 Ill. App. 3d 844, 849-50, 392 N.E.2d 33. Judgment *n.o.v.* was granted when no buyers from a new supplier testified they would have purchased from plaintiff, but instead uncontradicted evidence indicated many buyers were dissatisfied with or had not done business with plaintiff in *Universal Lite Distributors, Inc. v. Northwest Industries, Inc.* (4th Cir. 1979), 602 F.2d 1173, 1175-76. A plaintiff failed to establish lost profits when no basis in actual costs was provided for calculating a net margin per item and the witness furnishing the margin figure denied that it represented the profit on the item in *Kinetico, Inc. v. Independent Ohio Nail Co.* (1984), 19 Ohio App. 3d 26, 29-30, 482 N.E.2d 1345, 1349-50. None of these factors are involved in the present case.

## IV

Error is next identified in Cox' testifying as an expert witness concerning lost profits, which is claimed to have violated Supreme Court Rule 220. (107 Ill. 2d R. 220.) Cox' testimony assertedly involved application of economic theories of incremental profits and elasticity not explainable by an unschooled lay witness; however, because Mini Comp did not disclose Cox as an expert to Oakleaf as required by Rule 220, admission of his testimony is alleged to have been error.

At trial, after Cox began discussing projections based on quotas

Oakleaf objected that such testimony was speculative; it did not assert that Rule 220 was being violated. Cox showed the jury a chart listing expenses for the period from June 1978 through December 1979, categorized those expenses, and obtained the figure $1,128,839. Oakleaf again objected, based on Cox' alleged deficient background in accounting, claiming that Cox could not be cross-examined as a layman on elasticity. Cox' testimony, however, was based upon his personal knowledge and experience in the computer business.

■■■ Oakleaf then obtained court permission to use its own expert as a witness. When Mini Comp questioned that permission, it cited Rule 220. Only then did Oakleaf mention Rule 220, without making an objection: "MR. CARPONELLI [Oakleaf's counsel]: Your Honor, let me go back to 2.20 [*sic*]. They did not disclose that the witness was going to testify. That is expert testimony." Oakleaf complained that Cox was making projections based on assumptions. During argument on its motion for a directed verdict, Oakleaf moved to strike Cox' testimony on damages because it was too speculative and not competent, not because of any alleged violation of Rule 220. Having failed to properly raise an objection based on Rule 220 at trial, Oakleaf waived it. (*Von Seggren v. Smith* (1987), 151 Ill. App. 3d 813, 815, 503 N.E.2d 573.) Paradoxically, Oakleaf at trial objected to Cox' testimony for a reason opposite to that now raised on appeal: that Cox was not qualified to provide such testimony.

Oakleaf was permitted to call its own expert witness although Mini Comp's designated expert did not testify, and thereby had ample opportunity to rebut Cox' testimony about damages, both through cross-examination of Cox and by its expert witness. We find neither prejudice to Oakleaf nor error here.

## V

As its final argument, Oakleaf claims that prejudicial hearsay testimony was admitted and improper remarks were made by Mini Comp's counsel in closing argument, including alleged remarks of Oakleaf managers that Elkov wanted to take Mini Camp's distributorship away, statements by a Reynolds' employee concerning problems Reynolds had with Oakleaf, and references by Mini Comp to the $6 or $7 million Oakleaf received from its sales to Reynolds.

■■■ Statements made by a party or on his behalf inconsistent with his litigation position may be introduced into evidence against him. (*Mortell v. Insurance Co. of North America* (1983), 120 Ill. App. 3d 1016, 1028, 458 N.E.2d 922.) An agent may make an admission regarding a matter within the scope of his authority while the em-

ployment relationship exists. (*Nicholson v. St. Anne Lanes, Inc.* (1985), 136 Ill. App. 3d 664, 669-70, 483 N.E.2d 291.) At bar, Oakleaf objected to Burns' testimony that Oakleaf managers told him that Eklov "always did want to get you" and Eklov wanted Mini Comp's distributorship ended. Oakleaf objected on the basis that these regional managers were not in the control group of the organization. At trial, however, Eklov indicated he tried to work with Mini Comp. Burns' testimony therefore was inconsistent with Oakleaf's position; it could have been offered to show Eklov himself made such statements to his managers and not as "calculated character assassination," as Oakleaf suggests.

██ Oakleaf maintains that the testimony of the Reynolds employee concerning poor service from Oakleaf was immaterial; however, no objection was made as to relevance and was therefore waived. Determining relevance is generally within the circuit court's discretion (*Prevendar v. Thonn* (1988), 166 Ill. App. 3d 30, 37, 518 N.E.2d 1374); no abuse thereof is demonstrated here.

As to Mini Comp's closing argument, remarks were made concerning the money Oakleaf received for its computers from Reynolds, particularly Mini Comp's comment that "a million is a drop in the bucket compared to that [six million dollars]." Neither of the remarks was objected to when made. Oakleaf insists that nothing in the record suggests it sold 1,000 computers to Reynolds or how much Oakleaf received for such sales. The Oakleaf-Reynolds contract was admitted into evidence, however, which provided for the sale of 1,000 computers. Further, in its opening statement, Oakleaf indicated the evidence would show Reynolds bought 110 computers per month for about one year from Oakleaf and that Reynolds bought and sold approximately 1,000 computers.

██ ■ Improper argument and attorney misconduct can justify granting a new trial; lawyers should not unfairly bias a jury by appealing to its emotions. (*Chakos v. Illinois State Toll Highway Authority* (1988), 169 Ill. App. 3d 1018, 1029; *Bisset v. Village of Lemont* (1983), 119 Ill. App. 3d 863, 865, 457 N.E.2d 138; *Brown v. G & M Distributors, Inc.* (1984), 122 Ill. App. 3d 435, 440-41, 461 N.E.2d 95.) It is improper to argue facts not in evidence. (*Mattice v. Klawans* (1924), 312 Ill. 299, 305-06, 143 N.E. 866, *cert. denied* (1926), 271 U.S. 685, 70 L. Ed. 1151, 46 S. Ct. 637.) Failing to object to an improper remark, however, generally constitutes a waiver of any objection (*Cahill v. Boury* (1986), 144 Ill. App. 3d 413, 415, 494 N.E.2d 256; *Copeland v. Johnson* (1965), 63 Ill. App. 2d 361, 367, 211 N.E.2d 387), unless otherwise litigants cannot receive a fair

trial (*McElroy v. Force* (1967), 38 Ill. 2d 528, 535, 232 N.E.2d 708; *Ferrer v. Vecchione* (1968), 98 Ill. App. 2d 467, 474, 240 N.E.2d 439). Mini Comp's invoking the image of Oakleaf's monetary gains from the Reynolds' agreement, however, was not objected to and cannot be said to have denied Oakleaf a fair trial.

For the foregoing reasons, the jury's verdict and judgment of the circuit court must be affirmed.

Affirmed.

BILANDIC and EGAN, JJ., concur.